# EXHIBIT "A"

**Edward T. Flosi, M.S.**
Law Enforcement Practices Expert
Law Enforcement Trainer
Justitia Consulting, Inc.
1519 E Chapman Ave #34
Fullerton, CA 92831
Cell: (408) 315-0520
Email: ed.flosi@gmail.com

1    I have been retained by Brian Ginter (Burke, Williams, Sorensen LLP) as an expert witness in the
2    civil action of Glover v City of Los Angeles, et al.  I am therefore submitting the following information
3    and report as required by Rule 26 of the Federal Rules of Civil Procedure.[1]

4    The findings and opinions in this report are based upon my review of the documents as
5    presented to me by counsel and other evidence related to this incident.  These findings are an overview
6    analysis based on the information currently available.

7    My findings and opinions are formed from: (1) the materials I have reviewed to date thus far
8    which provides me with information concerning the facts and circumstances as perceived by the officers
9    about what occurred during this incident, and (2) how a reasonable officer would have acted when
10   presented with similar circumstances, based upon his or her law enforcement and other related
11   professional training and experience.

12   As is my custom and practice, I reserve the right to amend, alter, enhance or delete findings and
13   opinions based upon my receipt and review of any subsequent new information pertaining to this case.

14   I have been retained by the Santa Clara County District Attorney's Office on thirteen occasions.
15   In each of these cases I was consulted on the officer's use of force regarding a case where a defendant
16   had resisted, delayed or obstructed the officer's arrest process.  In each of these cases, I was not
17   consulted until after the Santa Clara County District Attorney's Office had already made the decision to
18   prosecute the case believing the elements had been satisfied.  I have not been consulted on any cases
19   prior to the filing of the case.

20   A more detailed list of my consultations/retentions and testimony history can be found in the
21   attached Curriculum Vitae.

22   In 2007, I was contacted by the San Mateo County District Attorney's Office to provide
23   testimony in a case where a police officer was being prosecuted.  I had agreed to provide testimony to
24   assist in the prosecution of the officer but was prohibited from doing so by the San Jose Police
25   Department Assistant Chief of Police.

26   I have been retained as the "person most knowledgeable" witness in civil proceedings by the
27   San Jose City Attorney's Office on six occasions and have given depositions in three of the cases.  These
28   cases involved my testimony regarding the San Jose Police Department Use of Force Policy and Training.
29   In one case, I provided consultation that the officers had acted outside of policy and training.

---

[1] I was originally retained by Colleen Smith from the Los Angeles City Attorney's Office

**Edward T. Flosi, M.S.**
Justitia Consulting, Inc.

1    I have been consulted three times by the San Jose Police Department Internal Affairs Unit
2  regarding a complaint of excessive force.  In these consultations, I was asked several questions regarding
3  the training standards specifically related to the use of force.  I was never told the specific details of the
4  case being investigated and was not asked to render an opinion as to the conformance with San Jose
5  Police Policy.

6    The breakdown of my case retention is described on the table below (as of 7/3/2023). It should
7  be noted that retention on any of the cases does not necessarily imply that my opinion would have
8  supported or not supported the officer's actions. For example, on several retentions by the attorney
9  representing the officer, my opinion(s) of the officer's actions did not support the defense.

| Type | Number | Deposition Given | Testimony |
|------|--------|------------------|-----------|
| Criminal Prosecution (during PD) | 12 | | 3 |
| Criminal Prosecution (after PD) | 12* | | 6 |
| Criminal Defense | 2 | | |
| Civil Defense | 228 | 61 | 29 |
| Civil Plaintiff | 10 | 2 | 1 |
| Civil Plaintiff (Sub-contractor) | 2 primary expert / 3 assisting | 1 | |
| PMK for CSJ | 7 | 4 | |
| SJPD IA Consults | 3 | | |
| Other IA Consults | 3 | | |
| Employment Arbitration | 6 | | 4 |
| Civilian Civil Defense | 1 | | 1 |

10    * Five cases involved the prosecution of an on-duty deputy/officer

11    I was a full-time sworn Peace Officer for the City of San Jose from December 9, 1984, to
12  December 30, 2011.  I was awarded an Advanced Peace Officer (December 1990) and Supervisory Peace
13  Officer (September 2004) certificate from the California Commission on Peace Officer Standards and
14  Training (POST).

15    I have a Master of Science degree from the California State University at Long Beach in
16  Emergency Services Administration.  I graduated with Honors and was selected to the Graduate Dean's
17  List of University Scholars and Artists.  This honor is reserved for the top 1% of the graduating class.

18    I have a Clear Designated Subjects (Law Enforcement Occupations) Adult Teaching Credential
19  from the California Commission on Teacher Credentialing.  I was an Adjunct Instructor at West Valley
20  College for the Administration of Justice Department.  I was a member of the West Valley College
21  Administration of Justice Advisory Board.

22    I am currently an Adjunct Instructor at Fullerton College (Administration of Justice Department)
23  and El Camino College (Administration of Justice Department).

24    As a fulltime sworn member of the San Jose Police Department, I served in several capacities
25  that lend to my expertise in rendering my opinions.  One such assignment was from March 2005 to
26  September 2007.  During this period, I was assigned to the Research and Development Unit.  One of my

**Edward T. Flosi, M.S.**
Justitia Consulting, Inc.

1   assigned tasks was to assist in updating the Use of Force Policy and to create a Force Response
2   Reporting System.  In this position, I became intimately familiar with the genesis of the policy and the
3   reasoning and meaning of the involved sections.

4          I was a defensive tactics instructor (California POST Learning Domain 33) at the South Bay
5   Regional Training Consortium and/or the San Jose Police Department Academy for approximately twelve
6   years.  In my capacity as a defensive tactics instructor for the San Jose Police Department, I commonly
7   taught the legal aspects of an officer's use of force and policy concerns as they related to arrest and
8   control techniques and defensive tactics.  I have attended an 80-hour California POST approved
9   Defensive Tactics Instructor course to become a POST certified Defensive Tactics Instructor.  For a period
10  of approximately seven years I acted as a lead instructor for Defensive Tactics for both organizations.  In
11  my capacity as a lead instructor, I have assisted in the instruction of two Defensive Tactics Instructor
12  courses and had been the primary lead instructor in four other Defensive Tactics Instructor courses.

13         I was a lead instructor for Use of Force – cognitive (California POST Learning Domain 20) at the
14  South Bay Regional Training Consortium and/or the San Jose Police Department Academy for
15  approximately nine years.  In my capacity as a Use of Force – cognitive instructor for the San Jose Police
16  Department, I commonly taught the legal aspects of an officer's use of force and policy concerns as they
17  related to use of force.  I have been directly involved as a California POST committee member in two
18  prior revisions of the Learning Domain 20 Workbook and participated remotely in the 2015 revision.

19         I have been a California POST approved Force Options Simulator (FOS) instructor since January
20  2000. In order to become a FOS instructor, I attended the 40-hour California POST approved FOS
21  Instructor Course. I was a Force Options Simulator (FOS) Instructor for the San Jose Police Department
22  starting in the year 2000 when I was designated as the lead instructor for the San Jose Police
23  Department FOS program.  Shortly after becoming the lead instructor, I was asked by California POST to
24  become the lead instructor for the FOS Instructor course for the Northern California Regional Skills
25  Centers.  In my capacity as a FOS instructor for the San Jose Police Department, I commonly taught the
26  legal aspects of an officer's use of force and policy concerns as they related to use of force.  I retained
27  this title until my promotion in September 2001.  I continued to teach the FOS program for South Bay
28  Regional Training Center for several years after my promotion.

29         I was an active member of the California POST FOS committee from 2000 up until my
30  retirement.  This committee met approximately every six months to discuss training trends and use of
31  force issues within the curriculum.  I have been directly involved in developing the past and present
32  curriculum for the California POST FOS program.  I was the supervisor for the San Jose Police
33  Department FOS program from March 2009 to December 2011.

34         I was a member of the California POST Law Enforcement Officers Killed and Assaulted (LEOKA)
35  Council for approximately six years.  In this capacity, I reviewed the facts and circumstances surrounding
36  several officer involved killings.  I assisted in the preparation of the California POST LOEKA 2000-2004
37  report and in the production of the California POST LOEKA 2005-2009 report. In 2017, I was invited to
38  rejoin the LEOKA committee.

**Edward T. Flosi, M.S.**
Justitia Consulting, Inc.

1      I have been retained as a "Subject Matter Expert" to assist California POST on two video
2  productions involving the use of force by a peace officer.  These projects developed training guidelines
3  for the use of O.C. Spray, Electronic Weapons and Projectile Impact Weapons.

4      I participated as a "Subject Matter Expert" in a California POST committee to develop an end-
5  user and instructor level Electronic Weapons Course.

6      As a "Subject Matter Expert" I assisted California POST in the production of the web-based
7  training program designed to test an officer's perception of danger which could lead to an assault.

8      I have been a TASER instructor since September 2005.  I attended my original TASER Instructor
9  course in September 2005 and recertified as a TASER Instructor in May 2009, July 2011 and June 2014.
10  These courses were certified as instructor level courses by TASER International.

11      From 2005 – 2007, I taught "Force Documentation" at the San Jose Police Department
12  Supervisors Course.  This course is given to newly promoted supervisors.  My block of instruction
13  covered how to; (1) properly document a force response event, and (2) properly evaluate an officer's
14  use of force.

15      I was one of the primary developers of the Institute for the Prevention of In-Custody Deaths
16  (IPICD) Amendment based use of force training course titled, "Use of Force by the Numbers: 4, 8, 14."
17  This 16-hour course was designed to teach students how to train officers to make force options
18  decisions and evaluate an officer's use of force without a continuum model.  The course focuses on
19  using the 4th, 8th, and 14th Amendment based analyses and based on judicial interpretation of various
20  case law decisions.  My primary responsibility was to assist in the development of curriculum and to
21  present on the topic of the 4th Amendment application as described in Graham v Connor (490 U.S. 386,
22  397 (1989)).

23      I presented twice at the IPICD Forensic Analyst Course on Amendment-based Force Analysis in
24  Criminal and Internal Investigations, once in Nevada and once in Maryland.  My two-hour presentation
25  topic included how to properly evaluate a police officer's use of force using Amendment based analyses
26  based on judicial interpretation of various case law decisions specifically including discussion on; (1) the
27  Supreme Court's decision in Graham v. Connor and its application to the 4th Amendment, and (2)
28  California Penal Code § 835a as an example of State statutory law.

29      In September of 2006, I attended an eight (8) hour training session from the Force Science
30  Institute taught by Dr. Bill Lewinski.  I also attended and successfully completed the certification process
31  of the forty (40) hour Force Science Institute Certification Course in June of 2009. Attendees who
32  successfully complete the program are certified in "Force Science Analysis."  This designation attests
33  that the holder has been trained to recognize and articulate important psychological, biological, and
34  physiological factors that can influence human behavior and memory in force encounters and pursuit
35  situations.

**Edward T. Flosi, M.S.**
Justitia Consulting, Inc.

1       I have published several articles involving a police officer's use of force and/or defensive tactics
2  issues.  I am a regular contributor to PoliceOne.com on the topic of police training specifically involving
3  defensive tactics and the use of force.

4       I attended a 40-hour California POST certified Crisis Intervention Team (CIT) Academy in
5  November of 2008 and remained a San Jose Police Department CIT member until my retirement in
6  December of 2011.

7       I have taught the Excited Delirium Response segment at the San Jose Police Department CIT
8  Academy from 2007-2019 and at the Santa Clara County CIT Academy from 2010-2012.

9       In April of 2010, I attended an eight (8) hour Threat Assessment, De-Escalation of EDP
10  (Emotional Disturbed Persons) training provided by Edgework Crisis Intervention Training.

11       I served as a "Subject Matter Expert" assisting the Santa Clara County Mental Health
12  Department with "Innovation Project 8."  This project involved the use of interactive video simulation
13  training for Crisis Intervention Team (CIT) training and was designed to teach officers to effectively
14  communicate and problem solve with a person with mental illness.

15       My qualifications to provide expert testimony about perception, memory and reaction time of
16  law enforcement officers and eyewitnesses; and the interactions of officers and suspects during use-of-
17  force encounters are based on:

18    • My education, personal experiences, and training (both formal and informal) I have received and
19      have conducted for other police officers;
20    • The scope of my expertise in these areas concerns investigating and analyzing police use-of-
21      force events, how involved officers and eyewitnesses perceive and remember these events, why
22      involved officers and/or witnesses to such events might have inaccurate recall, reaction time,
23      lag time, and officer-suspect interactions;
24    • My analysis is similar to that of other police practices experts in these areas and has a factual
25      foundation based on widely accepted and consistently cited facts about the dynamics of human
26      perception and memory and research during officer-suspect interactions;
27    • My understanding of the facts of this case; and
28    • My recognition that there will be factors or evidence that may either support, not support, or
29      have a neutral effect upon my opinion.

30       Like many other police practices experts, I have taken classes taught by Dr. William Lewinski,
31  founder of the Force Science Institute (FSI) and other instructors, speakers and presenters.  The FSI is
32  comprised of three divisions, including the Force Science Research Center (FSRC). The FSRC conducts
33  scientific research designed to increase the understanding of officer and suspect behaviors in force
34  encounters.  While much of the research has focused on deadly force encounters, the same human
35  performance factors apply to events involving less or non-deadly encounters.   In addition to attending a
36  total of 8 hours of classroom instruction from Dr. Lewinski and others in September of 2006, I
37  successfully completed the 40-hour Force Science Certification Course in June of 2009.

**Edward T. Flosi, M.S.**
Justitia Consulting, Inc.

1    The Certification Course covers the basics of anatomy and physiology of perception, including
2    how people acquire, retain and recall memories; the biomechanics of officer movements in relation to
3    suspect movements during force encounters; reaction time; and exploring why an officer's or witness'
4    account of an incident might be in conflict with physical evidence.  In addition to conducting a case
5    study and presentation within a work group, I had to pass a 60-question, multiple-choice exam to
6    graduate from the course as a certified "Force Analyst."

7    FSI also has published articles and studies on these topics for several years.  I consistently read
8    the articles and studies published by FSI prior to attending the classes and Certification Course.  I also
9    have continued my reading to increase and reinforce my understanding of these areas.

10   Based on my training, experience and research, I have a good comprehension of the mechanics
11   of these areas and have applied it in my teaching and actual field work.

12   I have published articles on police tactics that included reaction time and lag time and that have
13   been used to teach law enforcement officers on these subjects, including a peer-reviewed article
14   including the topic (2003, Submission Recognition, *The Police Chief*).

15   I have taught law enforcement defensive tactics to recruit officers and in-service officers for
16   over 15 years. In teaching this subject, I include human factor issues.  I also assisted in creating a drill to
17   teach officers how to mitigate/shorten reaction time to a fisted strike attack. The drill was tested to
18   measure its efficacy.

19   I have taught law enforcement use of force for about 20 years. In these teachings, I have used
20   lecture-based learning to reinforce tactics and techniques to mitigate/shorten reaction times based on
21   my education on the topic and on my own personal experiences. I have used scenario-based training to
22   observe human performance issues and to create strategies to mitigate reaction time and stress factors
23   based on my education on the topic and on my own personal experiences. In these scenario training
24   settings, I have witnessed perception/reaction time gaps thousands of times and used those examples in
25   the debriefing of the officer taking the training, including possible tactics/techniques to mitigate the gap
26   in future encounters.

27   I taught law enforcement emergency vehicle operations for approximately 10 years and the Law
28   Enforcement Driving Simulator (LEDS) program for approximately 5 years. As a driving instructor, I had
29   to have a better than average understanding of reaction time issues and how to address them in
30   lecture-based training and on-track training. Some of the basic principles that were reinforced were; (1)
31   scanning your surroundings, keeping a high visual horizon and keeping a safe distance around your
32   vehicle, and (2) how fatigue or drowsiness can affect your vision and increase reaction time to hazards.
33   It is noted that these same principles are so generally accepted that they are included in the California
34   Driver's Handbook.

35   As a law enforcement practitioner, I have experienced the perception/reaction time gap several
36   hundreds of times in both driving situations and in situations dealing with subjects involved in use of
37   force investigations.

**Edward T. Flosi, M.S.**

Justitia Consulting, Inc.

1　　　　I am currently the President of Justitia Consulting, Inc. My duties in this capacity include case
2　consultation and expert witness testimony.  I am currently the Principal Instructor for PROELIA Defense
3　and Arrest Tactics.  My duties in this capacity include use of force and defensive tactics instruction,
4　curriculum development and course coordination.

5　　　　A more detailed list of my education, publications, training and experience can be found in the
6　attached Curriculum Vitae.

7　　　　I am an impartial investigator and expert.

8　　　　I am being compensated for my services at the following rates:

9　　　　　• $200/hour* – Report review/report writing
10　　　　• $300/hour* – Live or telephonic conferencing/consulting
11　　　　• $300/hour – Deposition and/or testimony (minimum 4 hours billing)
12　　　　• $2000/day – Daily rate for consultation/trial or site visit
13　　　　• $100/hour* – Travel rate (not including travel expenses)
14　　　　• $100/hour** – Trial or testimony stand-by time
15　　　　• $150 – Filing, billing, administrative and office supply fee (one-time fee per case)
16　　　　• Travel expenses will be billed at actual costs, including but not limited to; (1) airfare, (2)
17　　　　　ground transportation, (3) lodging, and (4) meals at GSA rate, and (5) reasonable
18　　　　　incidentals
19　　　　• *billed per half hour
20　　　　• **billed per quarter hour

21　　　　　　　　　**DOCUMENTS REVIEWED FOR THIS ANALYSIS**

22　　　　Commencing in May 2022, the defense counsel began presenting me with a compilation of
23　evidentiary documents for my review in preparation for opining on this case.

24　　　　As is usually the practice in cases such as this, I am aware that there will be additional
25　documents or other evidence that might subsequently become available during the discovery process
26　that I will want to review which may assist me in developing more detailed findings and opinions.
27　Therefore, I reserve the right to amend my findings and opinions at some later date based upon my
28　ability to review any additional records and/or items of evidence I might subsequently receive.

29　　　　The documents, evidence and research I have reviewed and performed to date are listed below:

30　　1.  First Amended Complaint, February 10, 2022
31　　2.  Plaintiff's Reponses to Defendant City's Request for Production of Documents, Set One, October
32　　　　18, 2022
33　　3.  Plaintiff's Reponses and Objections to Defendant City's Interrogatories, Set One, October 18,
34　　　　2022
35　　4.  Los Angeles Police Department (LAPD) Arrest Report 21-04-06926 [DEFT 1001-1013]
36　　5.  LAPD Investigative Report 21-04-06926 [DEFT 1014-1021]
37　　6.  LAFD – Incident Details [DEFT 1022]

7

**Edward T. Flosi, M.S.**
Justitia Consulting, Inc.

7. LAPD Forensic Science Division Lab Report for DNA Return [DEFT 1023-1025]
8. LAFD Prehospital Care Report [DEFT 1026-1028]
9. LAPD Forensic Science Division Lab Report for DNA Collection [DEFT 1029-1030]
10. LAPD Forensic Science Division Lab Report for Scene Lab Report [DEFT 1031]
11. LAPD Forensic Science Division Lab Report for Firearm Render Safe {DEFT 1032-1033]
12. LAPD Follow-up Report 04-06926 [DEFT 1034-1036]
13. LAPD Forensic Science Division Lab Report for Glover's gun [DEFT 1037-1043]
14. LAPD Forensic Science Division Lab Report for Higareda's pistol [DEFT 1044]
15. LAPD Incident Recall PD21031900003834 [DEFT 1045-1047]
16. LAPD Incident Recall PD21031900003839 [DEFT 1048-1104]
17. Medical Records [DEFT 1105-5167]
18. LAFD Prehospital Care Report [DEFT 5168-5170]
19. LAPD Forensic Science Division Lab Report for Narco Lab [DEFT 5171]
20. LAPD Property Report [DEFT 5172-5179]
21. CHP 555 Report [DEFT 5357-5365]
22. LAPD Use of Force policy [DEFT 5366-5371]
23. Search Warrant and Reurn for Vehicle [DEFT 5372-5378]
24. LAPD FID Report F017-21
25. FID Statement Transcripts (Audio files were available)
  a. Antoinette Martinez [WM] [DEFT 5545-5582]
  b. David Lara [WM] [DEFT 5583-5620]
  c. Kate Mason [WM] [DEFT 5621-5644]
  d. Mario Arroyo [WM] [DEFT 5645-5671]
  e. Officer Adam Mott [WM] [DEFT 5672-5714]
  f. Officer Michael Malone [WM] [DEFT 5715-5768]
  g. P2 Juan Aguila [DEFT 5769-5852]
  h. P3 Alejandro Higareda [WM] [DEFT 5853-5927]
  i. Robert Negrete [WM] [DEFT 5928-5947]
  j. Sandra Arroyo [WM] [DEFT 5948-5961]
  k. Sergeant Angel Bonilla [WM] [DEFT 5962-5987]
  l. Sergeant Gustavo Gutierrez [WM] [DEFT 5988-6021]
  m. Sergeant Jose Vazquez [WM] [DEFT 6022-6040]
  n. Solana Loya Lara [WM] [DEFT 6041-6055]
26. Depositions
  a. Alejandro Higareda
  b. Juan Aguila Hernandez
  c. Nathan Rocky Glover
27. Video Files
  a. DICVS Clip
  b. 43315@20210319185229 (DICVS)
  c. Aguila_Axon_Body_3_Video_2021-03-19_1853 [DEFT 6058]
  d. Higareda_Axon_Body_3_Video_2021-03-19_1853 [WM] [DEFT 6067]
28. Photos:
  a. 0798655 [WM] [DEFT 5379-5521]

**Edward T. Flosi, M.S.**

Justitia Consulting, Inc.

      b.  0800344 [DEFT 6086-6087]

      c.  0800345 [DEFT 6088-6199] FINAL

      d.  0800400 [DEFT 6200-6217] FINAL

      e.  0800401 [DEFT 6218-6261] FINAL

      f.  0801801 [DEFT 6262-6449] FINAL

29. California POST Basic Academy Workbook Learning Domain 15 – Laws of Arrest

30. California POST Basic Academy Workbook Learning Domain 16 – Search and Seizure

31. California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

32. California POST Basic Academy Workbook Learning Domain 23 – Crimes in Progress

33. California POST Basic Academy Workbook Learning Domain 28 – Traffic Enforcement

34. California POST Basic Academy Workbook Learning Domain 29 – Traffic Accident Investigation

35. California POST Basic Academy Workbook Learning Domain 33 – Arrest and Control

36. California POST Basic Academy Workbook Learning Domain 34 – First Aid and CPR

37. California POST Basic Academy Workbook Learning Domain 35 – Firearms/Chemical Agents

38. California POST Basic Academy Workbook Learning Domain 39 – Crimes Against the Justice System

**DETAILS OF THE INCIDENT**

On March 19, 2021, at approximately 18:53 hours, Los Angeles Police Department (LAPD) Officer Alejandro Higareda and LAPD Officer Juan Aguila were on-duty and were in full police uniform in a clearly marked LAPD black and white police vehicle equipped with a forward-facing red light.

It is noted that the officers conducted a check of their emergency equipment at the beginning of their shift and it was fully functional and operational.

The officers saw a subject in the driver's seat of a 2010 4-door Nissan Altima (CA/ 8KTZ126). The vehicle was parked adjacent to a red curb at Ithaca Ave and Haven St in the City of Los Angeles in violation of California Vehicle Code §21458(a)(1) – Red zone - no parking.[2]

Higareda testified that at first he did not know the subject was Nathan Rocky Glover.[3]

The officers decided to conduct traffic enforcement and drove toward the vehicle. They stopped for a few seconds in the intersection to run the plate on the vehicle before attempting their stop and parking behind the vehicle.

At approximately 18:53:02 hours, Aguila is seen running the license plate query on the MDC. The returns came back at approximately 18:53:02 hours.[4]

---

[2] California Vehicle Code §21458(a): Whenever local authorities enact local parking regulations and indicate them by the use of paint upon curbs, the following colors only shall be used, and the colors indicate as follows: (1) Red indicates no stopping, standing, or parking, whether the vehicle is attended or unattended, except that a bus may stop in a red zone marked or signposted as a bus loading zone.

[3] Higareda Deposition; 21: 19-20

[4] Aguila_Axon_Body_3_Video_2021-03-19_1853 [DEFT 6058]

**Edward T. Flosi, M.S.**

Justitia Consulting, Inc.

1       The vehicle returned to Nathan Glover. Higareda told Aguila that Higareda had prior contact with
2  Glover and knew him to have prior arrests for firearms possession. Higareda also knew Glover to be an El
3  Sereno gang member from the Ithaca Street Loco's clique who goes by the moniker of "Riot."

4       At approximately 18:53:20 hours, although there is no audio at this point, Aguila is seen
5  apparently broadcasting the stop as Higareda is driving slowly towards Glover's vehicle.[5]

6       The LAPD FID report reads that Aguila broadcasted, "4A6, Code Six on 8KTZ126, Ithaca and
7  Haven."

8       At approximately 18:53:27 hours, Higareda is seen putting the LAPD vehicle into park.[6]

9       Below is a screen capture of the dash camera showing the vehicle parked near the corner. It is
10  noted that the lightbar indicator is showing on the frame. This shows that the emergency lights were
11  activated while the vehicle was still stopped in this position.



12

13       Below is a screen capture from Google Street View Maps showing the red painted curb where
14  the vehicle was stopped. This shows the same red painted curb as photo file DEFT 6216.

---

[5] Aguila_Axon_Body_3_Video_2021-03-19_1853 [DEFT 6058]
[6] Aguila_Axon_Body_3_Video_2021-03-19_1853 [DEFT 6058]

**Edward T. Flosi, M.S.**
Justitia Consulting, Inc.



1



2

3   Higareda activated the forward facing red light and siren to initiate the stop. As Higareda pulled

4 in behind the vehicle, a siren can be heard giving a short sound just before Higareda puts the LAPD

**Edward T. Flosi, M.S.**

Justitia Consulting, Inc.

1    vehicle in park. Higareda started to exit the driver's side of the LAPD vehicle and told Glover to turn off
2    the car.[7]

3         Higareda saw Glover look back in the sideview mirror and then Glover reversed his vehicle and
4    backed in the direction of the LAPD vehicle. As the vehicle reversed, Higareda heard what he believed to
5    be the manipulation of a weapon (the racking of the action of a pistol from inside the car). Glover's
6    vehicle collided with the front of the LAPD vehicle. The FID report contains a photo of scuff marks on the
7    front bumper of the LAPD vehicle caused by the collision.[8]

8         At approximately 18:53:34 hours, the sound of what appears to be a collision can be heard on
9    Aguila's BWV.

10        Glover then drove forward and fled from the officers. The officers immediately re-entered their
11   police vehicle and pursued Glover's vehicle. At approximately 18:53:41 hours, Higareda directed Aguila
12   to broadcast they were in pursuit.[9]

13        At approximately 18:53:46 hours, Aguila broadcasted, "4A6 show us in pursuit of that vehicle. It
14   just attempted to hit the officers."[10]

15        Communications Division acknowledged and broadcasted, "All units on all frequency standby.
16   4A6 is in pursuit of a assault with correction assault on a PO, Ithaca and Haven, 8KTZ125, 8KTZ126, 4A6
17   your location now?"[11]

18        At approximately 18:54:00 hours, Higareda's BWV captured Higareda telling Aguila that they
19   were in pursuit of a "415 man with a gun."

20        The officers pursued Glover as he drove recklessly at a high rate of speed for several blocks.
21   Glover lost control of his vehicle and collided into the residence at 2902 Bullard Avenue, Los Angeles, CA.

22        Higareda told Aguila to request an ambulance due to the collision as Higareda exited their LAPD
23   vehicle.

24        Higareda said, "As I get out of the car, I'm thinking I got to render some aid even though he's a
25   suspect and, you know, he's still a – he's still a citizen, a community member so I need to render some
26   aid not only to Mr. Glover. I need to check on everyone inside that residence also because they could be
27   hurt."[12]

28        At approximately 18:54:11 hours, Aguila broadcasted, "The vehicle just TC'd into a house, Bullard
29   and Chester. 415 man with a gun. Requesting an RA."[13]

---

[7] Higareda_Axon_Body_3_Video_2021-03-19_1853 [WM] [DEFT 6067]
[8] LAPD FID Report F017-21, p. 3
[9] LAPD FID Report F017-21, p. 3
[10] LAPD FID Report F017-21, p. 3 and Aguila_Axon_Body_3_Video_2021-03-19_1853 [DEFT 6058]
[11] LAPD FID Report F017-21, p. 3
[12] LAPD FID Report F017-21, p. 5, Higareda Statement; 18: 9-14
[13] LAPD FID Report F017-21, p. 5 and Aguila_Axon_Body_3_Video_2021-03-19_1853 [DEFT 6058]

**Edward T. Flosi, M.S.**

Justitia Consulting, Inc.

1        Glover exited his vehicle on the driver side and ran in a southerly direction behind the rear of his
2  car across the front yard armed with a pistol.

3        Higareda saw Glover holding a pistol in Glover's right hand.

4        Higareda recognized Glover and yelled, "Don't fucking move. Nathan! He's got a gun! Don't
5  move, don't move!" as Higareda and Aguila moved to the yard and driveway of the home.

6        Higareda momentarily lost sight of Glover. Higareda moved south where he regained sight of
7  Glover. Higareda saw Glover was holding the gun in his right hand as Glover ran. Glover lifted the gun up
8  back toward Higareda and Aguila. Higareda said, "That gun comes, and it points itself back towards me
9  so I'm seeing the barrel of the gun being pointed at me now and then it swings and he's pointing it at my
10  partner. Well, when I see the barrel of the gun pointing at me that led me to believe that there was an
11  eminent [sic] threat of serious bodily injury or death."[14]

12        Video file "DICVS Clip" at approximately 00:58 on the counter shows Glover running near the
13  driveway of the home. Glover's right hand is extended back and raised in the direction that Higareda
14  would have been approaching.



15

---

[14] LAPD FID Report F017-21, p. 6

**Edward T. Flosi, M.S.**

Justitia Consulting, Inc.



1

2       Video file "Aguila_Axon_Body_3_Video_2021-03-19_1853 [DEFT 6058]" at approximately 02:48

3 on the counter shows Glover running near the driveway of the home. Glover's right hand is extended

4 back and raised in the direction that Higareda would have been approaching.



5

14

**Edward T. Flosi, M.S.**

Justitia Consulting, Inc.



1

2    Aguila ran from the passenger side of the police vehicle toward the driveway of 2902 Bullard

3    Avenue and yelled at Glover not to move.

4    Aguila said, "I hear my partner say, 'Partner, gun.' That's when I unholster and I – I observe the --

5    the gun myself."[15]

6    Aguila said that he saw Glover running across the driveway. Aguila saw what he believed to be a

7    gun either in the waistband or in Glover's hand which was at his waist.[16]

8    At approximately 18:54:20 hours, Higareda fired one round at Glover from a distance of

9    approximately 28 feet in response to the imminent threat of serious bodily injury or death.[17]

10    Higareda identified the background as the number two wall of the neighbor's house located at

11    2826 Bullard Avenue.

12    Immediately prior to the OIS, video file "Higareda_Axon_Body_3_Video_2021-03-19_1853 [WM]

13    [DEFT 6067]" at approximately 02:56 on the counter, appears to show Glover with a black object in his

14    right hand.

---

[15] LAPD FID Report F017-21, p. 7, Aguila Statement; 46: 3-4

[16] Aguila Statement; 9: 7-10, 46: 17-21

[17] Higareda_Axon_Body_3_Video_2021-03-19_1853 [WM] [DEFT 6067] and LAPD FID Report F017-21, p. 7

**Edward T. Flosi, M.S.**

Justitia Consulting, Inc.



1



2

3    Glover was struck once and dropped the gun as he fell to the ground. Glover fell in some tall
4    grass in a position where he was eventually in a seated position facing towards the officers while leaning
5    against the neighboring home.

6    Higareda said that he could see Glover's hands but could not see where the gun was at that
7    time. The officers held their position near cover and cleared Glover's vehicle.

8    Higareda and Aguila waited for additional units to arrive before taking Glover into custody.

9    At approximately 18:57:59 hours, the officers began to carefully approach Glover as the location
10   of Glover's pistol was still unknown.

**Edward T. Flosi, M.S.**
Justitia Consulting, Inc.

1    At approximately 18:58:34 hours, Higareda apparently saw Glover's pistol in the grass saying,
2    "It's over there."[18]

3    Higareda said he saw the firearm approximately four feet east of Glover's location in the tall
4    grass and advised the officers of its location.[19]

5    Photos of the location where the gun was located are captured on photo files DEFT 6158-6162
6    near evidence marker 1.

7    At approximately 18:58:37 hours, it appears that Higareda makes physical contact with Glover to
8    begin taking Glover into physical custody. Higareda pulls Glover into the driveway and away from where
9    the pistol fell. Glover is then taken into custody and handcuffed without incident.

10   Glover was transported to the University of Southern California Medical Center (USCMC) for
11   medical treatment.

12                      **ANALYSIS OF INCIDENT, POLICE PRACTICES AND**
13              **LAW ENFORCEMENT ACTIONS TAKEN; EXPERT'S OPINIONS & FINDINGS**

14   The findings and opinions are based upon my initial review of the documents as presented to
15   me by the defense counsel and other evidence related to this incident. My findings and opinions are
16   formed from: (1) the totality of facts and circumstances known/perceived by the officers, (2) my own
17   training and experience, (3) California POST standards, and (4) what the appropriate reactions would
18   have been from an officer when presented with similar circumstances, based upon their law
19   enforcement and other related professional training and experience.

20   I reserve my right as an expert to alter, amend, enhance, or delete my findings and opinions as
21   necessary following my review of any additional discovery in this case.

22   Based on the totality of my training, education, and experience in law enforcement; as a law
23   enforcement trainer; as a criminal justice educator; and, as a police practices consultant, I have
24   developed the following opinions to a reasonable degree of professional certainty in the field of law
25   enforcement practice.

26   **1. Los Angeles Police Department (LAPD) Officer Alejandro Higareda and LAPD Officer Juan Aguila had**
27   **a legitimate law enforcement purpose and reasonable suspicion – based on current law enforcement**
28   **training and practices – to contact and detain Glover as he sat in the driver's seat of an illegally parked**
29   **vehicle near the intersection of Ithaca Ave and Haven St in Los Angeles, CA. The officers' actions were**
30   **consistent with current law enforcement training and practices.**

31   Peace officers are trained that to lawfully detain a person, reasonable suspicion is needed.  A
32   detention is a temporary stop of a person in order to investigate whether or not the person had been
33   engaged, is currently engaging or is about to engage in criminal activity.

---

[18] Higareda_Axon_Body_3_Video_2021-03-19_1853 [WM] [DEFT 6067]
[19] LAPD FID Report F017-21, p. 10

17

**Edward T. Flosi, M.S.**
Justitia Consulting, Inc.

1        Officers are trained that for an investigative stop or detention to be valid, there must be
2  reasonable suspicion that: (1) criminal activity may be afoot and (2) the person about to be detained is
3  connected with that possible criminal activity.  To establish reasonable suspicion, both the quality and
4  quantity of the information needed is considerably less than the probable cause needed to arrest or
5  search.[20]

6        Officers are trained that the purpose of a detention is to resolve whether suspicious behavior is
7  innocent or relates to crime.  Therefore, the possibility of an innocent explanation does not deprive the
8  officer of the capacity to entertain a reasonable suspicion of criminal activity. Detention law accepts the
9  risk that officers may stop innocent people.[21]

10       Officers are trained that whether they are detaining someone (1) to investigate the officer's
11  reasonable suspicion or (2) to issue a citation, the subject has an obligation to stop. The subject has no
12  right to resist a lawful detention.  If the subject does not stop, he/she has violated California Penal
13  Code§ 148 by obstructing or delaying the officer in the performance of the officer's duties and the
14  officer may use physical force to make him stop.[22]

15       Peace Officers are trained that they are permitted to use reasonable force to effect a detention
16  as described in the California Penal Code section 835:

17           An arrest is made by an actual restraint of the person, or by submission to the custody of an
18           officer. The person arrested may be subjected to such restraint as is reasonable for his arrest
19           and detention.[23]

20       Peace Officers are trained that they are permitted to effect a detention as described in the
21  California POST Learning Domain 15.

22           Peace officers may need to detain a person to investigate involvement in criminal activity. To be
23           lawful, a detention must be based on reasonable suspicion that criminal activity has taken place,
24           is taking place, or is about to take place, and that the person detained is connected to that
25           activity.[24]

26           Reasonable suspicion is when a peace officer has enough facts and circumstances present to
27           make it reasonable to suspect that criminal activity is occurring and the person detained is
28           connected to that activity.[25]

29           Reasonable suspicion may be based on observation, personal training and experience, or
30           information from eyewitnesses, victims, or other officers (totality of the circumstances).

---

[20] California Peace Officers Legal Sourcebook
[21] California Peace Officers Legal Sourcebook
[22] California Peace Officers Legal Sourcebook
[23] California POST Basic Academy Workbook Learning Domain 15 – Laws of Arrest
[24] California POST Basic Academy Workbook Learning Domain 15 – Laws of Arrest
[25] California POST Basic Academy Workbook Learning Domain 15 – Laws of Arrest

**Edward T. Flosi, M.S.**
Justitia Consulting, Inc.

Some factors that contribute to establishing reasonable suspicion include:

- appearance or condition of a person (intoxicated, resemblance to wanted person)
- actions (hiding objects, furtive movements, running from a crime scene)
- knowledge of the person's "history" (criminal record or conduct)
- demeanor (non-responsive, nervous)
- location of the stop (near crime scene, known criminal activity in area)
- officer training and experience (modus operandi, expertise in certain area such as narcotics or gang activity)[26]

California Vehicle Code §21458 reads in relevant part, "(a) Whenever local authorities enact local parking regulations and indicate them by the use of paint upon curbs, the following colors only shall be used, and the colors indicate as follows:(1) Red indicates no stopping, standing, or parking, whether the vehicle is attended or unattended, except that a bus may stop in a red zone marked or signposted as a bus loading zone."

It is my professional opinion that Los Angeles Police Department (LAPD) Officer Alejandro Higareda and LAPD Officer Juan Aguila had a legitimate law enforcement purpose and reasonable suspicion – based on current law enforcement training and practices – to contact and detain Glover as he sat in the driver's seat of an illegally parked vehicle near the intersection of Ithaca Ave and Haven St in Los Angeles, CA. The officers' actions were consistent with current law enforcement training and practices.

**2. LAPD Officer Alejandro Higareda and LAPD Officer Juan Aguila had a legitimate law enforcement purpose and probable cause – based on current law enforcement training and practices – to arrest Glover once Glover; (1) attempted to flee from the detention, and (2) collided with the LAPD vehicle and left the scene without providing identification. The officers' actions were consistent with current law enforcement training and practices.**

Officers are trained the Fourth Amendment of the U.S. Constitution requires probable cause to make arrests and/or conduct searches because searches or arrests conducted without probable cause infringe on a person's privacy.[27]

Officers are trained that probable cause for an arrest is a set of facts that would cause a person of ordinary care and prudence to entertain an honest and strong belief that the person to be arrested is guilty of a crime. Probable cause is required before an arrest is made and is based on the totality of the circumstances.[28]

It must be pointed out that the standard of probable cause does not require absolute certainty that the person to be arrested did in fact commit the crime.

Officers are trained that whether probable cause exists depends upon the reasonable conclusions that can be drawn from the facts known to the arresting officer at the time of the arrest. Sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment.

---

[26] California POST Basic Academy Workbook Learning Domain 15 – Laws of Arrest
[27] California POST Basic Academy Workbook Learning Domain 15 – Laws of Arrest
[28] California POST Basic Academy Workbook Learning Domain 15 – Laws of Arrest

**Edward T. Flosi, M.S.**

Justitia Consulting, Inc.

Probable cause does not require certain, positive information, or even enough to convict someone.  It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.[29]

Officers are trained that the facts required to establish probable cause may include, but are not limited to:

- direct investigation or reports
- circumstantial evidence
- second-hand statements from reliable sources[30]

Officers are trained that an officers' expertise is part of the equation for determining probable cause. For officers versed in a specific field of law enforcement, an activity which might otherwise appear innocent may provide probable cause to a trained eye.[31]

Officers are trained that Penal Code §836 establishes the legal basis for an arrest by peace officers. Officers may make an arrest:

- pursuant to a warrant
- without a warrant
  - whenever they have probable cause to believe the person to be arrested has committed a public offense (felony or misdemeanor) in their presence;
  - when the person arrested has committed a felony, although not in the officer's presence;
  - whenever they have probable cause to believe the person to be arrested has committed a felony, whether or not a felony has in fact been committed.[32]

Officers are trained that an arrest is taking a person into custody, in a case and in the manner authorized by law. The arrest must be based on probable cause.[33]

It is noted that as Glover fled from the officers, Glover drove through multiple stop signs and on the wrong side of the road at excessive speeds. It is my professional opinion that Glover would have been in violation of California Vehicle Code §23103(a), which reads, "(a)  A person who drives a vehicle upon a highway in willful or wanton disregard for the safety of persons or property is guilty of reckless driving." It is noted that reckless driving is a bookable misdemeanor.

It is my professional opinion that LAPD Officer Alejandro Higareda and LAPD Officer Juan Aguila had a legitimate law enforcement purpose and probable cause – based on current law enforcement training and practices – to arrest Glover once Glover; (1) attempted to flee from the detention, and (2) collided with the LAPD vehicle and left the scene without providing identification. The officers' actions were consistent with current law enforcement training and practices.

**3. The deadly force response by Higareda was appropriate and reasonable to; (1) prevent a perceived imminent and credible threat of serious bodily injury or death, and (2) to prevent the escape of a**

---

[29] California Peace Officers Legal Sourcebook
[30] California POST Basic Academy Workbook Learning Domain 15 – Laws of Arrest
[31] California POST Basic Academy Workbook Learning Domain 15 – Laws of Arrest
[32] California POST Basic Academy Workbook Learning Domain 15 – Laws of Arrest
[33] California POST Basic Academy Workbook Learning Domain 15 – Laws of Arrest

**Edward T. Flosi, M.S.**
Justitia Consulting, Inc.

1  **fleeing subject that had threatened Higareda with a firearm – probable cause to believe that the**
2  **subject had committed a crime involving the infliction or threatened infliction of serious physical**
3  **injury or death – and that subject poses a threat of death or serious physical harm, either to the**
4  **officer or others if allowed to escape. The deadly force response was appropriate and consistent with**
5  **current law enforcement training standards in consideration of the "totality of circumstances"**
6  **presented to Higareda at the moment force was used.**

7  Police officers are trained that they are permitted to use reasonable force to effect an arrest,
8  prevent the escape or to overcome the resistance of a suspect:

9      Any peace officer who has reasonable cause to believe that the person to be arrested has
10     committed a public offense may use reasonable force to:
11         • effect the arrest,
12         • prevent escape, or
13         • overcome resistance.

14     A peace officer who makes or attempts to make an arrest:
15         • need not retreat or desist from his efforts by reason of the resistance or threatened
16           resistance of the person being arrested
17         • shall not be deemed an aggressor
18         • shall not lose his right to self-defense by the use of reasonable force to effect the arrest
19           or to prevent escape or to overcome resistance.[34]

20  Police Officers receive training that the United States Supreme Court established how force
21  must be judged from an objectively reasonable standard (Graham v. Connor, 490 U.S. 386, 109 S.Ct.
22  1865 (1989)).[35] The Court's analysis began by considering the subject's Fourth Amendment right to
23  remain free from any unreasonable seizure against the government's interest in maintaining order
24  through effective law enforcement.

25  When reviewing and analyzing an officer's use of force under a standard of "objective
26  reasonableness," officers are trained that the Graham decision gave an overarching guideline to those
27  that are charged with analyzing an officer's force response. Officers are told that the calculus of
28  reasonableness must embody allowance for the fact that police officers are often forced to make split-
29  second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount
30  of force that is necessary in a particular situation.[36]

31  The California POST Learning Domain 20 workbook states, "In some instances, peace officers
32  may have time to evaluate and assess all aspects of a situation. In most situations, split-second decisions
33  must be made."[37]

---

[34] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[35] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[36] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[37] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

**Edward T. Flosi, M.S.**

Justitia Consulting, Inc.

1    The California POST Learning Domain 20 workbook states:

2    The Court noted that determining the objective reasonableness for the use of force must be fact
3    specific, and established the following four components for determining reasonableness:

4    The reasonableness of a particular use of force must be...
5    1. judged from the perspective of a reasonable officer.
6    2. examined through the eyes of an officer on the scene at the time the force was applied, not
7       the 20/20 vision of hindsight.
8    3. based on the facts and circumstances confronting the officer without regard to the officer's
9       underlying intent or motivation.[38]

10    A reasonable officer is defined as would another officer, facing a similar set of circumstances,
11    act in the same way or use similar judgement.[39]

12    In addition to the guideline listed above, other important factors to consider include, but are not
13    limited to; (1) the severity of the crime at issue, (2) whether the subject poses an immediate threat to
14    the safety of the officers or others, (3) and whether the subject is actively resisting.[40]  These factors are
15    described as "governmental interests" and weighed as a totality of the circumstances and balanced
16    against the quantum (or level) of force used by the officers.  The quantum of force is determined by the
17    type of force option used and the manner in which it was used.

18    Since the Graham decision, officers are trained that other courts have added to and rearranged
19    the factors listed. Officers within the 9th Circuit have been trained to recognize these factors listed in
20    "importance" as:
21        1.   The threat of the suspect to officer/others
22        2.   The resistance of the suspect
23        3.   The "Pace of the Event"
24        4.   The severity of the crime at issue
25        5.   The nature of the escape attempt

26    Other factors that have been identified and that officers have been trained to understand that
27    may or may not be applicable to the specific situation are:
28        1.   Number of Officers vs. Suspects
29        2.   Were cover officers enroute or on-scene?
30        3.   Access to Potential Weapons
31        4.   Age; Size; Relative Strength
32        5.   Special Knowledge or Skill Level
33        6.   Injury or Exhaustion
34        7.   Mental Illness or Drug Usage

---

[38] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[39] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[40] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

**Edward T. Flosi, M.S.**

Justitia Consulting, Inc.

             a.  Higher pain tolerance

             b.  Unable to understand commands

    8.   Prior Contacts

    9.   Environmental Factors

             a.   Lighting, space limitations, footing, crowds, traffic

    10. Availability of other reasonable force options

    11. Was there an opportunity to warn and was there a warning given?

    12. Was the subject able to cease resistance and/or comply with commands?

Understanding the importance of what an officer reasonably believed based on facts and circumstances known or perceived is paramount to the analysis of any force response by an officer. As previously stated, the force must be judged from the perspective of a reasonable officer and examined through the eyes of an officer on the scene at the time the force was applied. To understand the perspective, one must understand the perception of the officer on scene. While it is important to learn the perception of other involved parties to better understand the incident in an overall sense, the appropriateness of the force response must rely upon the perception of the officer responding with the force option.

The evaluation must be made from the perspective of the officer. In simple terms, the officer does not need to be correct for his/her actions to be objectively reasonable under the totality of the facts and circumstances known and perceived by the officer.

Perception is the process of applying stored knowledge to sensory input (see, feel, hear, smell, taste) and forming an interpretation and is truly key to evaluating the reasonableness of any force application. It is important to also note the perception is individual to each officer based on the facts and circumstances known to the officer and his training and experience. It is important to also understand that sometimes an action outside the expected can raise a perceived threat level.

In evaluating the objective reasonableness of an officer's use of force, there must be a reasonable balance between; (1) "why" the officer used the force option (governmental interests), and (2) "what" type of force option was used and "how" it was used (level/quantum of force).

One way police officers are trained to determine the reasonable level/quantum of force is to examine the reasonably likely injury expectation of the force option. It is important to evaluate the expectation based on what the officer knew and perceived rather than the actual outcome as they can be drastically different in some cases.

Police officers are trained that they need not use lesser intrusive force options that may be ineffective or not feasible before using a reasonable force option for the facts and circumstances. Considering all possible options may be difficult and even impossible in high-risk environments due to the time pressure, task complexity, and environmental uncertainty. In these types of situations officers often must rely on intuitive decision making during potential use of force encounters.

**Edward T. Flosi, M.S.**
Justitia Consulting, Inc.

1      In any incident, there are uncertainties and there are numerous option choices available to the
2    officer(s) throughout the incident as it unfolds. Many of them are not well defined. Much of what
3    officers do is based on; (1) experience, and (2) the totality of the facts and circumstances
4    known/perceived by the officer. Manuals and training simply cannot cover everything. Officers do not
5    have the ability to predict the future with 100% certainty.

6      In the California POST Basic Academy, officers receive training regarding the use of force.  On
7    two occasions while still an active peace officer I participated directly in assisting California POST review
8    and update the Learning Domain 20 (Use of Force) workbook giving me a unique understanding of the
9    content of the workbook and I base my opinions on these writings.  In the 2015 update, I participated
10   remotely.

11      By definition, the use of a firearm is deadly force.  Police officers are taught that deadly force is
12   force that creates a substantial risk of causing death or serious bodily injury.[41]

13      Police officers are trained that they may use deadly force under certain circumstances.

14   <u>Deadly Force Training Standards: "Force on Force"</u>

15      "Force on Force" refers to a situation when an officer perceives that a subject is presenting an
16   imminent threat of serious bodily injury or death to the officer or to others based on the totality of the
17   facts and circumstances known/perceived by the officer at the time.

18      Officers are trained that imminent means, "a threat of death or serious injury is "imminent"
19   when, based upon the totality of the circumstances, a reasonable officer in the same situation would
20   believe that a person has the present ability, opportunity, and apparent intent to immediately cause
21   death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a
22   fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm,
23   but is one that, from appearances, must be instantly confronted and addressed."[42]

24      Examples of this would be a subject; (1) drawing/accessing a firearm in the presence of an
25   officer, (2) moving the muzzle of a firearm towards an officer or another, (3) shooting at an officer or
26   another person, and/or (4) moving towards an officer or another person, with a weapon that could
27   reasonably be believed to be able to create serious bodily injury or death while having the ability to use
28   that weapon against the officer or another.

29      This is taught as "to protect life" and reads in relevant part, "a peace officer is justified in using
30   deadly force upon another person only when the officer reasonably believes, based on the totality of the
31   circumstances, that such force is necessary to defend against an imminent threat of death or serious
32   bodily injury to the officer or to another person."[43]

---

[41] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[42] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[43] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

**Edward T. Flosi, M.S.**
Justitia Consulting, Inc.

1    Reverence for all life is the foundation on which the use of deadly force rests.  This reverence is
2    not solely directed at the subject, it includes the life of the officer him/herself and of others.

3    One of the primary objectives in using deadly force is to immediately stop the subject from
4    continuing their actions.  To this end, police officers are trained to shoot for center mass of the subject
5    in order to increase the likelihood of hitting the subject in a location that would stop the subject.  It is
6    well known that under stress conditions marksmanship will decrease and that shooting at smaller
7    targets such as hands or limbs becomes extremely difficult.  These targets also may not have the desired
8    effect of immediately stopping the subject's actions.  Targeting these non-center mass areas commonly
9    leads to missing the target completely due to the size and the speed of movement of the limbs and
10   hands.  With each miss the officer takes more risk that the subject will continue his/her actions to cause
11   serious bodily injury or death.

12   If the situation has risen to the level that the officer reasonably believes that the officer's or
13   other person's life is in imminent danger of serious bodily injury or death, officers are trained to shoot
14   until the threat is stopped.  Officers are taught to continually assess the threat while shooting.

15   The limitations of sidearms being able to immediately stop the threat are well-known. In
16   research involving "deanimation," a threatening subject's cessation of movement after he or she has
17   been shot, most cardiologists agree with the five-second rule. When blood pressure drops suddenly to
18   near zero, most people will still remain animated for at least five more seconds before ceasing to be a
19   threat. Five seconds is considered the minimum. Some cardiologists insist the real figure is closer to 10
20   seconds or more.

21   Officers are trained that they may reasonably use deadly force when confronted by a perceived
22   armed suspect in close proximity whose actions indicate an intent to attack. An officer is not required to
23   wait in order to find out if the suspect will, in fact, injure or kill the officer.

24   Learning Domain 20 demonstrates that officers do not need to always exhaust all other means
25   of force applications if the situation dictates a deadly force application as a reasonable option.  In the
26   immediate case in question, it would not be an appropriate tactical decision to try lesser intrusive means
27   to stop Glover based on the immediacy of the perceived threat and the need to immediately stop his
28   actions.

29   Officers are trained that they need not wait until the gun is actually pointed at them or until a
30   gun is fired at them to respond with deadly force to prevent the attack from happening. Based on the
31   totality of the circumstances known and perceived by Higareda, it would be reasonable for an officer in
32   the same situation to believe that Glover was preparing to shoot at the officers.

33   It must be clearly pointed out that it is the actions of Glover that was creating this life-
34   threatening situation and forced Higareda to react quickly and decisively.

35   Deadly Force Training Standards: "Fleeing Subject"

**Edward T. Flosi, M.S.**

Justitia Consulting, Inc.

Officers are trained that deadly force may be used against a fleeing subject under certain conditions. This training includes that, "In 1985, the United States Supreme Court decided the case of Tennessee v. Garner. The Court applied the following points with regards to when it would be reasonable for an officer to use deadly force against a fleeing subject in this particular set of circumstances (e.g., using a firearm to stop a fleeing suspect escaping on foot)." The particular set of circumstances include:

- "...if the subject threatens the officer with a weapon or there is *probable cause* to believe that he has committed a crime involving the infliction of serious physical injury [or death]..."
- "...*probable cause* to believe that the subject poses a threat of death or serious physical harm, either to the officer or others..."
- "...*probable cause* to believe that the use of deadly force is reasonably necessary..."[to prevent escape]
- "...some warning be given prior to the use of deadly force where feasible..."[44]

Officers are trained that this standard does not require the subject to be actually armed at the moment of the deadly force application but rather it is based on the dangerousness of the subject based on his/her actions and behaviors (*probable cause* to believe that he has committed a crime involving the infliction of serious physical injury [or death]) that may create the threat of death or serious bodily injury to others if allowed to escape.[45]

Although the text in the Basic Academy LD 20 workbook reads as written above, the case decision and the training officers receive include, "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction <u>or threatened infliction</u> of serious physical harm, deadly force may be used if necessary to prevent escape."

Higareda fired one round from his Glock Model 21, .45 caliber semi-automatic pistol. The pistol was test fired using the above listed magazine with laboratory ammunition and was functional. The trigger pull value is within the LAPD Armory's established acceptable range for this firearm.[46]

Higareda reassessed after the shot and saw that Glover had fallen to his knees and was no longer holding a gun. Higareda stopped firing.[47]

Glover was armed with a semi-automatic pistol, 9mm Luger caliber, Polymer 80, model PF940V2, no serial number. The pistol was tested and found to be functional.[48]

---

[44] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[45] Forrett v. Richardson, 112 F.3d 416 (9th Cir. 1997) - A burglary suspect shot a victim during the burglary. Then the burglary suspect fled - while unarmed. The court found that "... the suspect need to not be armed or pose an immediate threat to the officers or others at the time of the shooting."
[46] Los Angeles Police Department Forensic Science Division Lab Report for Higareda's pistol
[47] Higareda Statement; 49:24 – 50:8
[48] Los Angeles Police Department Forensic Science Division Lab Report for Glover's gun

**Edward T. Flosi, M.S.**

Justitia Consulting, Inc.

1    The investigation revealed that the magazine dropped to the ground as Glover ran across the
2    yard but continued to hold the pistol. The magazine was recovered adjacent to the driver's side door on
3    Glover's vehicle at the scene.[49]

4    Photos of the magazine are captured on photo files DEFT 6163-6165 near evidence marker 2.

5    Glover's pistol was recovered and found to have no ammunition in the chamber nor a magazine
6    in the magazine well.

7    On May 10, 2021. LAPD Criminalist Randy Zepeda prepared a report detailing a DNA comparison
8    of evidence. Criminalist Zepeda compared DNA obtained from a buccal swab of Glover to both the pistol
9    and the magazine recovered at scene. It was determined that 88% of the DNA profile recovered from the
10   pistol and 89% of the DNA profile recovered from the magazine belonged to contributor Nathan Glover.[50]

11   It is noted that the Los Angeles District Attorney's Office filed the following charges:
12   • California Penal Code §29800(A)(1) PC – Felon in Possession of a Firearm
13   • California Penal Code §30305 PC – Felon in Possession of Ammunition
14   • California Vehicle Code §20002 CVC – Hit and Run[51]

15   **Force Analysis: Deadly Force**

16   **The threat to the safety of the officer or others**: Higareda and Aguila individually articulated
17   that they saw Glover in possession of the pistol as Glover fled on foot from the vehicle. Higareda said
18   that Glover pointed the pistol in Higareda's and Aguila's direction as Glover ran away. There is video
19   evidence that supports this perception. Therefore, at the time of the deadly force application, the threat
20   level was high and life-threatening.

21   Based on the totality of the facts and circumstances perceived/known at the time, Higareda
22   made several statements that would lead a reasonable officer to believe that Glover was an imminent
23   threat of serious bodily injury or death.

24   Higareda said, "I get out of the car and there's a little black car, a dark-colored car parked in the
25   street. I come towards the front end of that car at which point I see Mr. Glover exiting the car. Okay. He's
26   – he's not hurt. He's able to -- to walk. He's getting out of the car. So, when I see him exit, I see him
27   holding a black semiautomatic pistol in his right hand. So, this confirms what I thought earlier when I
28   heard this, you know, the slide, the slide rack. Okay. So, I -- I wasn't hearing things. I know what I heard,
29   and this guy has a pistol and now I -- this guy has a pistol with the round chambered."[52]

30   In regards to unholstering his pistol, Higareda said, "I unholstered as soon as I saw Mr. Glover
31   holding that pistol in his hand, you know. And once again, I unholstered based on the fact that I believe

---

[49] LAPD Follow-up Investigation Report 21-0406926 and LAPD FID Report F017-21, p. 15
[50] LAPD Follow-up Investigation Report 21-0406926
[51] LAPD Follow-up Investigation Report 21-0406926
[52] LAPD FID Report F017-21, p. 6, Higareda Statement; 18:15-25

**Edward T. Flosi, M.S.**

Justitia Consulting, Inc.

1  the situation could escalate to the use of deadly force. Well, I mean, this guy's holding a pistol so that's,
2  you know, he shoots -- he shoots me I'm going to have to defend myself."[53]

3         Higareda said, "When I run into the driveway, I see Mr. Glover. He comes back into my sight
4  picture. I go in and I see him and he's holding the gun in his right hand as he's running southbound
5  through the driveway. That gun comes, and it points itself back towards me so I'm seeing the barrel of
6  the gun being pointed at me now and then it swings and he's pointing it at my partner. Well, when I see
7  the barrel of the gun pointing at me that led me to believe that there was an eminent [sic] threat of
8  serious bodily injury or death."[54]

9         Higareda saw Glover "looking around" as if Glover was trying to acquire a target. The front of
10 Glover's torso was pointing away from Higareda. Higareda said that Glover was running southbound and
11 was located northwest of Glover. The gun was in Glover's right hand and Glover's arm was pointed in a
12 northwest direction towards Higareda. Higareda said Glover's arm then started to move towards
13 Aguila.[55]

14        Higareda testified that he made the decision to fire "based off the fact that Nathan was pointing
15 the gun directly at me, and that threat was an imminent threat of, you know, I basically I thought he's
16 going to shoot me right now."[56]

17        Higareda testified, "When I decided to protect my life from that imminent threat which was
18 Nathan pointing the gun at me, I intentionally pressed the trigger. I wanted to fire because I was in fear
19 for my life."[57]

20        It is known that a person does not need to be looking in the direction of an intended target to be
21 able to fire a gun in the direction of the intended target.

22        **The level of resistance by the subject**: The level of Glover's perceived resistance was articulated
23 by Higareda at the time of the deadly force application in the incident as high.  The amount and type of
24 control is dependent on the level of resistance offered by the subject.  The California POST workbook for
25 Use of Force (Learning Domain 20) describes four levels of resistance and provides possible force option
26 solutions for each level.  In this incident at the time of the deadly force application, Glover's perceived
27 resistance by Higareda can be classified as "life-threatening resistance." Life-threatening resistance is
28 defined as:

29        "Any action likely to result in serious injury or possibly the death of the officer or another
30        person."[58]

31        The California POST workbook suggests possible force options when a subject is perceived to be
32 displaying life-threatening resistance as:

---

[53] LAPD FID Report F017-21, p. 6, Higareda Statement; 45: 10-16
[54] LAPD FID Report F017-21, p. 6, Higareda Statement; 20:18 – 21:2
[55] Higareda Statement; 47:20 – 48:24
[56] Higareda Deposition; 49: 21-24
[57] Higareda Deposition; 51: 6-9
[58] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

**Edward T. Flosi, M.S.**

Justitia Consulting, Inc.

1    "Utilizing firearms or any other available weapon or action in defense of self and others."[59]

2    Based on the totality of the circumstances related to the perceived level of resistance by Glover,
3    it can be concluded that the level of resistance was high and weighs heavily towards the need to use
4    significant levels of appropriate force including deadly force to immediately and quickly stop Glover's
5    actions.

6    **Pace of the Event:** The pace of this event at the moments that Higareda responded with deadly
7    force can be described as fast, sudden and rapidly evolving. Higareda's decisions had to be made quickly
8    and in a time compressed manner. Officers are trained on how the pace of the event can be a factor in
9    the overall reasonableness evaluation.[60]

10    At the time of the deadly force response, Higareda was forced to make time compressed
11    decisions that required split-second life-threatening decision making.

12    There is a well-known training principle in law enforcement referred to as the reactionary gap.
13    This is the time that it takes a person to perceive a stimulus and then react to that stimulus. On the
14    average, it takes a person approximately .7- 1.5 seconds to perceive and react to the stimulus. These
15    times may vary depending on certain factors, but one thing is consistent within the principle. The person
16    that creates the stimulus (actor) is always ahead of the person having to react to the stimulus (reactor). I
17    have received advanced training in the reactionary gap and have read various studies on this topic. I
18    have seen and experienced this reactionary gap in practice. I have personally witnessed this reactionary
19    gap thousands of times in training scenarios that I conducted with in-service and recruit officers.

20    Based on my training and experience in the area of the reactionary gap, I know that an officer
21    can perceive facts and circumstances that combine to make the decision to respond with force, but
22    there is a gap in time between the perception of those facts and circumstances and the actual
23    application of force. It is therefore possible that the situation has changed at the very moment of the
24    force application.

25    On March 29, 2021, Force Investigation Division (FID), Video Technology Unit Detective Luis
26    Alarcon conducted a sound analysis of Higareda's BWV and the DICVS video. The analysis identified one
27    gunshot. The elapsed time from when Glover was depicted with his right arm extended toward Higareda
28    to the time when Higareda fired was 1.640 seconds.[61]

29    As a law enforcement practitioner, I have experienced the perception/reaction time gap several
30    hundreds of times in both driving situations and in situations dealing with subjects involved in use of
31    force investigations. I have seen this reactionary gap at the end of an action hundreds of times in Force
32    Option Simulator training.

---

[59] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[60] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[61] LAPD FID Report F017-21, p. 9

**Edward T. Flosi, M.S.**

Justitia Consulting, Inc.

1    In previous cases that I was retained on involving officer involved shootings, I have made this
2    observation in Rule 26 reports.

3    During dangerous encounters the vision will change to narrow the focal vision to focus on the
4    threat. As the person becomes "oriented" toward the threat he/she will shift their attention toward the
5    threatening behaviors (i.e., body/hand movements) and "focus" on those behaviors or funnel their
6    concentration in on it – to the exclusion of other things in the sensory environment.

7    At the time that an officer makes the decision to respond with a firearm, the officer would need
8    to change his/her focus onto his/her front sight. If the officer has a pistol and is not currently looking
9    through the sights, the officer would need to change his/her focus onto his/her front sight. In moving the
10   focus to the front sight, the officer will lose some level of detail on the subject.

11   Indeed, Higareda testified that he understood this principle by saying, "when you're actually
12   focused on the front sight, your eyes are actually zoned in on the front sight and everything else is
13   blurry." Higareda was focused on his front sight just to deal with the threat. He was not looking for the
14   gun.[62]

15   Higareda continued, "Once again, when that threat presented itself and he pointed the gun at
16   me, I made the decision to shoot and discharge my pistol. So my focus goes to my front sight."[63]

17   Without changing focus to the front sight, an officer would not be able to be as accurate with
18   his/her shooting and would; (1) create a danger to people in the background that were not necessarily in
19   the perceived line of fire, and (2) not be able to stop the threat effectively by missing the target.

20   The focal vision can be as tight as only 5 degrees of angle. For example, if the distance between
21   Higareda and Glover was 28 feet, the focal vision could be just less than 35" in total width.  Placing
22   Glover in the center of that focal vision would then equate to just less than 17.5" on either side of the
23   center line within Higareda's focal vision.[64]

24   This process can take a measurable amount of time especially if the officer is moving and trying
25   to slow or stop as well. It is my professional opinion that the 1.640 seconds from when Glover was
26   depicted with his right arm extended toward Higareda to the time when Higareda fired is consistent with
27   the above stated factors.

28   **Severity of the Crimes at Issue:** Higareda reasonably believed several serious and life-
29   threatening crimes had been committed, were about to be (imminently) committed or being committed
30   at the time of the event and specifically at the time of the deadly force response. These crimes included:

31   • California Penal Code §245(c): Any person who commits an assault with a deadly
32     weapon or instrument, other than a firearm, or by any means likely to produce great
33     bodily injury upon the person of a peace officer or firefighter, and who knows or
34     reasonably should know that the victim is a peace officer or firefighter engaged in the

---

[62] Higareda Deposition; 49: 7-16
[63] Higareda Deposition; 50: 10-12
[64] At 5 degrees, the width is approximately 3.5" per every 3' of measure. At 30', the width of the focal vision at 5 degrees would be approximately 35".

**Edward T. Flosi, M.S.**
Justitia Consulting, Inc.

1  performance of his or her duties, when the peace officer or firefighter is engaged in the
2  performance of his or her duties.

3  • California Penal Code §417(c): Every person who, in the immediate presence of a peace
4  officer, draws or exhibits any firearm, whether loaded or unloaded, in a rude, angry, or
5  threatening manner, and who knows, or reasonably should know, by the officer's
6  uniformed appearance or other action of identification by the officer, that he or she is a
7  peace officer engaged in the performance of his or her duties, and that peace officer is
8  engaged in the performance of his or her duties.

9  • California Penal Code §187(a) Murder is the unlawful killing of a human being, or a
10  fetus, with malice aforethought.

11  • California Penal Code §664: Every person who attempts to commit any crime, but fails,
12  or is prevented or intercepted in its perpetration.

13  **The nature of the escape attempt:** At the moments leading into the deadly force response,
14  Glover was perceived to have been attempting escape. Although Higareda testified in his deposition that
15  he did not believe that the "fleeing felon" standard applied, he did articulate the factors within the
16  standard in his statements.

17  It is noted that Higareda perceived that Glover had threatened Higareda and Aguila with a
18  firearm – probable cause to believe that the subject has committed a crime involving the infliction of
19  serious physical injury or death. A reasonable officer would conclude that as Glover continued to flee
20  with the gun in hand, Glover posed a threat of death or serious physical harm, either to the officer or
21  others if allowed to escape.

22  Higareda and Aguila had broadcasted several times that would cause a reasonable officer to
23  believe that other officers would be responding to assist. A reasonable officer would therefore conclude
24  that if Glover had escaped from Higareda and Aguila into the neighborhood, that Glover would be a
25  threat of death or serious physical harm to responding officers if they encountered Glover during his
26  desperate attempt to escape.

27  It is also noted that Glover was heading towards a backyard of a residence within a heavily
28  residential area bordering commercial properties and a major roadway (Alhambra Ave). Based on the
29  time of day, a reasonable officer could conclude that it is likely that many of these businesses would be
30  open and that there would be people driving in the area. Allowing an armed subject who had already
31  been perceived to have pointed a firearm at an officer would pose a threat of death or serious physical
32  harm to others.

33  **Additional Commentary**

34  The complaint seems to take issue with the fact that Glover was shot in his back. Officers are
35  trained to target available center mass of the subject. It is noted that at the time of the OIS, it was
36  approximately 1.640 seconds after Glover was depicted with his right arm extended toward Higareda. A
37  subject's relative body position can change dramatically in that amount of time.

**Edward T. Flosi, M.S.**
Justitia Consulting, Inc.

It is also noted that Glover was a fleeing subject at the time of the OIS. It is therefore consistent that the back of his torso would be facing Higareda at the time of the OIS.

The complaint seems to take issue with the fact that Higareda did not provide a full warning to Glover prior to the OIS. Officers are trained that a warning is only required when that warning in feasible. In this incident, based on the amount of time allowed by Glover's behaviors and actions, it is my professional opinion that a full warning would not have been feasible due to the fact that officers are trained to focus on the deadly threat in these situations.

It is noted that Glover had every reason to know that Higareda was an officer. Higareda was in full LAPD uniform and driving an LAPD marked vehicle. Glover fled from the attempted detention at a high rate of speed. When Glover fled on foot from the vehicle, Higareda was fully visible and had his pistol drawn. Higareda was giving Glover commands to stop moving. Any reasonable person faced with these factors would surely understand that pointing a gun in the direction of the officer would result in a deadly force response, even without a full verbal warning.

It is noted that Higareda moved from a covered position to better observe Glover and to keep a visual surveillance on a subject Higareda had seen with a gun in hand. Officers are trained that sometimes they must take reasonable risks in order to accomplish a legitimate law enforcement objective. Indeed, officers are trained that, "Although officer safety is always an officer's chief concern, there are circumstances where officers must consider placing their safety in jeopardy to protect the innocent. The community has a right to expect that peace officers will "step into harm's way" on behalf of those endangered by violent crime. While an officer should not sacrifice their safety merely to apprehend a suspect, their ultimate duty is to protect others."[65]

In my professional opinion, it would have been an act of cowardice for an officer to have fully hidden behind the parked vehicle while Glover was moving towards Aguila's perceived position and also thereby allowing an armed subject to possibly disappear into the neighborhood.

Taking into consideration the facts and circumstances observed and perceived by Higareda prior to and at the time of the deadly force response (as detailed in the section titled, "Details of the Incident"), and based on the factors listed above in this section, it is my professional opinion that the deadly force response by Higareda was appropriate and reasonable to; (1) prevent a perceived imminent and credible threat of serious bodily injury or death, and (2) to prevent the escape of a fleeing subject that had threatened Higareda with a firearm – probable cause to believe that the subject had committed a crime involving the infliction or threatened infliction of serious physical injury or death – and that subject poses a threat of death or serious physical harm, either to the officer or others if allowed to escape. The deadly force response by Higareda was appropriate and consistent with current law enforcement training standards in consideration of the "totality of circumstances" presented to him at the moments deadly force was used.

**4. The officers requested timely medical assistance for Glover prior to and after the OIS. There is no independent or objective evidence to support the claim that the officers prevented medical personnel from treating Glover.**

---

[65] California POST Basic Academy Workbook Learning Domain 23 – Crimes in Progress

**Edward T. Flosi, M.S.**

Justitia Consulting, Inc.

1    Officers are trained that they should request medical assistance to the scene as soon as feasible.
2    Officers are trained to render medical assistance to the level of their training when it is safe and feasible
3    to do so.

4    There is video evidence that the officers requested medical assistance for Glover prior to the
5    OIS.

6    The video evidence shows that the officers broadcasted the request for an RA as quickly as
7    approximately 10 seconds after the OIS:

8    • At approximately 18:54:28 hours, Aguila's BWV captured as he attempted to broadcast,
9        "4A6 Shots fired! Get an RA here. Shots fired! Officers need help! Officers need help!
10       Shots fired!"[66]
11   • At approximately 18:54:45 hours, Higareda's BWV captured as he also attempted to
12       broadcast "4A6 Shots fired, Officers need help! Chester and Bullard, let me get an RA for
13       a suspect, he's down."[67]

14   It is noted that only a portion of Higareda's broadcast was captured that included, "let me get an
15   RA for a suspect, he's down."[68]

16   At approximately 18:55:52 hours, Higareda broadcasted, "4A6, and just to verify I need an RA for
17   a male, approximately 20 years old, conscious and breathing, suffering from a possible gunshot wound.
18   Go ahead and send me another RA cuz the vehicle TC'd into a house. I don't know if there's anyone
19   down inside the house."[69]

20   It is noted that the officers moved Glover from his position against the neighboring home to the
21   driveway and away from where the gun was located. It is my professional opinion that this movement
22   was consistent with the officers making the scene safer so that medical personnel could respond into the
23   scene and render assistance to Glover.

24   At approximately 19:05:09 hours, the LAFD personnel are seen arriving on scene and stopping
25   near the location.[70]

26   The first LAFD personnel is seen walking directly from the fire engine to Glover unimpeded by
27   the officers., arriving at Glover's location at approximately 19:05:43 hours. Other LAFD personnel
28   followed unfettered by the officers.

29   The LAFD was notified at approximately 18:57:18 hours. This was approximately 3 minutes after
30   the OIS. The following is a time summary of the LAFD arrival to the location:

31   • The LAPD advised that the LAFD was clear to enter at approximately 19:02:46 hours.
32   • The LAFD arrived on scene at approximately 19:04:21 hours.
33   • The LAFD transported Glover at approximately 19:18:53 hours.[71]

---

[66] LAPD FID Report F017-21, p. 9
[67] LAPD FID Report F017-21, p. 9
[68] LAPD FID Report F017-21, p. 9
[69] LAPD FID Report F017-21, p. 9-10
[70] Higareda_Axon_Body_3_Video_2021-03-19_1853 [WM] [DEFT 6067]
[71] LAFD – Incident Details

**Edward T. Flosi, M.S.**

Justitia Consulting, Inc.

1   It is my professional opinion that the officers requested timely medical assistance for Glover
2   prior to and after the OIS. There is no independent or objective evidence to support the claim that the
3   officers prevented medical personnel from treating Glover.

4   **5. There is no independent or objective evidence in the record to support the claim that the officers**
5   **gave knowingly and purposefully false statements to investigators.**

6   **6. There is no independent or objective evidence in the record to support the claim that the officers**
7   **racial profiled Glover because Glover was Hispanic.**

8   **7. There is no independent or objective evidence in the record to support the claim that the LAPD has**
9   **or maintains unconstitutional customs, practices or policies.**

10  **8. There is no independent or objective evidence in the record to support the claim that the LAPD**
11  **failed to supervise and/or train the officers involved in this incident.**

12  **9. There is no independent or objective evidence in the record to support the claim that the LAPD**
13  **ratifies any unconstitutional customs, practices or policies.**

14  I would so testify to the aforementioned findings and opinions under penalty of perjury if called
15  upon in any subsequent civil proceedings. Signed under penalty of perjury in accordance with the laws
16  of California and of the United States on July 27, 2023, in Fullerton, California.

17  Respectfully submitted,

18

19  Edward T. Flosi, M.S.
20  Justitia Consulting, Inc.

34