# EXHIBIT C

**Edward T. Flosi, M.S.**
Law Enforcement Practices Expert
Law Enforcement Trainer
Justitia Consulting, Inc.
1519 E Chapman Ave #34
Fullerton, CA 92831
Cell: (408) 315-0520
Email: ed.flosi@gmail.com

1        I have been retained by Brian Ginter (Burke, Williams, Sorensen LLP) as an expert witness in the
2    civil action of Glover v City of Los Angeles, et al.  This supplemental rebuttal report is an analysis of the
3    report submitted by Plaintiff's Expert Roger Clark.[1]

4        In Mr. Clark's report, dated July 28, 2023, his analysis contained errors and omissions of fact
5    and detail.  Mr. Clark misrepresents the fact pattern by ignoring facts from certain witnesses and the
6    sequence of events to support his opinion.

7        This rebuttal report intends to supply the information that is necessary to comprehensively
8    analyze this case and respond to Mr. Clark's assertions and opinions. The rebuttal is formatted to match
9    the page number and/or the section of Mr. Clark's report.

10        The findings and opinions in this report are based upon my review of the documents as
11    presented to me by counsel and other evidence related to this incident.  These findings are an overview
12    analysis based on the information currently available.

13        As is usually the practice in cases such as this, I am aware that there may be additional
14    documents or other evidence that might subsequently become available during the discovery process
15    that I will want to review which may assist me in developing more detailed findings and opinions.
16    Therefore, I reserve the right to amend my findings and opinions at some later date based upon my
17    ability to review any additional records and/or items of evidence I might subsequently receive.

18    **General Commentary on Mr. Clark's Report**

19        The format of this report will analyze each section of Mr. Clark's report individually. The sections
20    of Mr. Clark's report will be underlined and formatted to the left margin. My commentary/rebuttal will
21    follow in the indented paragraphs below each heading.

22        Although Mr. Clark claims that he does not make credibility determinations in expressing his
23    opinions, there are several points within his report that he appears to make credibility determinations
24    against the officers.

25        Any credible evaluator of a law enforcement officer's force response knows that the actions
26    must be evaluated based on the totality of facts and circumstances of what the officer reasonably
27    perceived at the time of the force response without consideration of what might be learned in hindsight.
28    The perceptions of the subject – while instructive to understand the mindset and beliefs of the subject –
29    are not to be included in the evaluation of the officer's actions.

---

[1] I was originally retained by Colleen Smith from the Los Angeles City Attorney's Office

**Edward T. Flosi, M.S.**
Justitia Consulting, Inc.

1    "Brief Overview of Events According to the Los Angeles Police Department Investigative Summary and
2    Commentary:" (p. 4)

3          Mr. Clark's brief overview fails to provide several documented details within the entire incident
4    while attempting to highlight several irrelevant details.

5          Mr. Clark calls out that the officers were not responding to a crime in progress or a call for help.
6    This statement is irrelevant as sworn peace officers are allowed to make personal observations of illegal
7    activity on their own without the assistance of the public.

8          Mr. Clark writes, "Mr. Glover (as recorded) never threatened to harm any Officer and was not an
9    immediate threat of death or serious bodily injury to any person at the time of the use of deadly force."

10          This statement appears to disregard the perceptions of Higareda and attempts to discredit his
11    statements. The recording appears to show that Glover pointed the gun in the direction of the officers.
12    Any reasonable officer would believe that a subject pointing a gun in their direction would be an
13    imminent threat of serious bodily injury or death.

14    Incident (pp. 4-10)

15          Mr. Clark completely omits the parking violation personally observed by the officers in his
16    description.

17          Mr. Clark completely omits that Higareda heard what he believed to be the manipulation of a
18    weapon (the racking of the action of a pistol from inside the car) prior to Glover driving away.

19          Mr. Clark completely omits that Glover reversed and collided with the LAPD vehicle prior to
20    when Glover "maneuvered forward and drove away."

21          Mr. Clark writes, "Officers Higareda and Aguila then exited the patrol vehicle and maneuvered
22    on foot towards Mr. Glover while Mr. Glover maneuvered on foot away from the Officers." This is not
23    entirely accurate as Glover had to first move in the direction of the officers to be able to round the back
24    end of the Nissan.

25          Mr. Clark appears to take issue with the screenshot captured by the dash camera of the LAPD
26    vehicle as evidence that Glover pointed the gun in the direction of the officers.

27          Mr. Clark writes, "Based on my review of the video evidence and the Officers' statements, Mr.
28    Glover never ran in the direction of any Officer, Mr. Glover did not point a gun at any Officer, and a gun
29    cannot specifically be identified in Mr. Glover's hands at any time."

30          Glover clearly had to at first run towards the officers to clear the back end of the Nissan.

31          Mr. Clark's complete dismissal of Higareda's perception – and the video evidence – that Glover
32    pointed the gun in Higareda's direction appear to be another attempt to disregard the perceptions of
33    Higareda and attempts to discredit his statements.

34          Mr. Clark writes, "Officer Higareda is (north) out of view in the image above, on the sidewalk. It
35    appears from review of the videos and by Mr. Glover's testimony that Mr. Glover tripped on some sort
36    of vegetation and was stumbling forward to regain his balance. It does not appear that Mr. Glover

2

**Edward T. Flosi, M.S.**
Justitia Consulting, Inc.

1   looked back at Officer Higareda, it does not appear that Mr. Glover rotated his body in the direction of
2   any Officer, and it does not appear that Mr. Glover had a gun in his hand at the time."

3   Mr. Clark appears to be giving Glover full credibility to as to what his actions were by describing
4   them as tripping or stumbling. Even if this were determined to be true, this is not what Higareda
5   perceived the action to be. Any credible evaluator of police conduct knows that an officers' actions must
6   be judged based on the officer's perception at the time of the incident, not a hindsight evaluation
7   conducted in the safety and comfort of an office with the ability to watch a video at different speeds
8   over several times.

9   Glover would not have to had "looked back at" Higareda to have fired the gun in Higareda's
10  direction. Glover was facing in the direction of the officers as he initially fled the Nissan. Higareda was
11  calling out verbal commands to Glover. This in combination would allow Glover to understand where
12  Higareda was located.

13  Mr. Clark's opinion that it does not appear that Glover had a gun in his hand runs contrary to
14  Higareda's perceptions. Mr. Clark fails to add that the gun was found near where Glover fell. There is a
15  screenshot of Glover holding what appears to be the gun in his right hand just prior to the OIS. Mr. Clark
16  also fails to consider that the BWC is worn at a different level on Higareda's body than what Higareda
17  would be seeing with his eyes. It also must be noted that BWV is often times blurry and pixelated when
18  movement is involved whereas the human eye is not effected in this way.

19  Mr. Clark writes, "Officer Higareda also stated that he made the decision to use deadly force
20  against Mr. Glover at this moment [referring to when Glover reached his arm back towards Higareda].
21  Importantly, the moment depicted above is not when Officer Higareda used deadly force." Mr. Clark
22  appears to not understand the proven phenomena of the reactionary gap wherein it takes a measurable
23  amount of time to; (1) perceive/recognize the threat, (2) make the decision to respond to the threat,
24  and (3) make the physical adjustments to be able to make the response happen.

25  There is a well-known training principle in law enforcement referred to as the reactionary gap.
26  This is the time that it takes a person to perceive a stimulus and then react to that stimulus. On the
27  average, it takes a person approx. .7-1.5 seconds to perceive and react to the stimulus. These times may
28  vary depending on certain factors, but one thing is consistent within the principle. The person that
29  creates the stimulus (actor) is always ahead of the person having to react to the stimulus (reactor). I
30  have received advanced training in the reactionary gap and have read various studies on this topic.

31  As a law enforcement practitioner, I have experienced the perception/reaction time gap several
32  hundreds of times in both driving situations and in situations dealing with subjects involved in use of
33  force investigations. I have seen this reactionary gap at the end of an action hundreds of times in Force
34  Option Simulator training.

35  In previous cases that I was retained on involving officer involved shootings, I have made this
36  observation in Rule 26 reports and have testified in federal court on the effects of the reactionary gap.

37  At the time that an officer makes the decision to respond with a firearm, the officer would need
38  to change his/her focus onto his/her front sight. Without changing focus to the front sight/optic dot, an
39  officer would not be able to be as accurate with his/her shooting and would; (1) create a danger to

3

**Edward T. Flosi, M.S.**
Justitia Consulting, Inc.

1   people in the background that were not necessarily in the perceived line of fire, and (2) not be able to
2   stop the threat effectively by missing the target.

3          This change in focus may cause the officer to lose some specific focus on subject, but the officer
4   would still be able to see gross movements to help determine if the threat has stopped.

5          Mr. Clark writes, "It is apparent from my review of the video evidence and Officer Higareda's
6   statements to detectives that Officer Higareda did not see Mr. Glover at the time depicted in this above
7   image." Mr. Clark again appears to disregard the perceptions of Higareda and attempts to discredit his
8   statements. Without running the videos in a side-by-side manner and being able to change the angle of
9   view from Higareda's BWC to what he would have seen at his eye level, this conclusionary statement by
10  Mr. Clark is reckless and invades the province of the jury.

11         Mr. Clark writes, "From Officer Higareda's perspective, best shown by his BWC video, when
12  Officer Higareda said, "He's got a gun," Mr. Glover was not in view of Officer Higareda. Mr. Glover was
13  behind some bushes at the time. Further, Officer Higareda stated that he had lost sight of Mr. Glover,
14  which is why Officer Higareda maneuvered south on the sidewalk to the driveway where he regained
15  sight of Mr. Glover again."

16         Higareda testified that he saw Glover with the gun early as Glover was initially exiting the
17  Nissan. Further, Higareda heard what he perceived as the racking of a pistol even before Glover took
18  flight from the officers in the Nissan. It would not be required that Higareda make the statement of
19  "He's got a gun" exactly at the moment after Glover began his flight in foot.

20         While it is true that Higareda said that he temporarily lost sight of Glover, Higareda said that he
21  regained sight of Glover and saw the actions of Glover that Higareda described as pointing the gun back
22  in Higareda's direction.

23         Mr. Clark writes, "Clearly, Officer Higareda never saw Mr. Glover tripping over the plants with
24  his arm extended backwards as described by FID Investigators. Furthermore, it is my opinion, based on
25  review of the video evidence, that any reasonable officer who did see Mr. Glover tripping would
26  recognize it as a subject tripping, falling forward, and not as a subject turning to point a gun at an
27  officer."

28         It must be strongly noted that this is a conclusionary statement that Higareda never saw
29  Glover's arm pointed backwards in Higareda's direction. This again appears to be another attempt to
30  disregard the perceptions of Higareda and attempts to discredit his statements and appears to be an
31  attempt to invade the province of the jury.

32         Higareda never "saw Glover tripping over the plants" because this is not what Higareda
33  perceived the actions to be. I disagree with Mr. Clark's conclusion that any reasonable officer would
34  perceive this as simply tripping and falling forward.

35         Mr. Clark writes, "As depicted in the videos, Mr. Glover never pointed a gun at Officer Higareda
36  or any other officer or person. A gun cannot be identified in Mr. Glover's hands from my review of the
37  videos. Mr. Glover was moving away from the Officers at the time Officer Higareda shot Mr. Glover in
38  the back. Mr. Glover never makes any motion that could be interpreted by a reasonable officer as
39  pointing a gun."

4

**Edward T. Flosi, M.S.**
Justitia Consulting, Inc.

1       This again appears to be another attempt to disregard the perceptions of Higareda and attempts
2  to discredit his statements. Mr. Clark fails to recognize the limitations of BWV as I have previously
3  pointed out.

4       Mr. Clark takes issue with the fact that Higareda did not provide a full verbal warning to Glover
5  prior to the OIS. I wrote about this concern in my Rule 26 report and that it is my professional opinion
6  that a full warning was not feasible.

7       Mr. Clark writes, "The officers did not attempt to coordinate their efforts to communicate, de-
8  escalate, or attempt any of the reasonable and available less-intrusive options."

9       In this incident, Glover's actions and behaviors did not allow any feasible amount of time to take
10  a timeout to have a tactical huddle to discuss any response plans.

11       De-escalation is a goal. It is a desired end. A preferred result. It is not a series of words or an
12  algorithmic formula which simply needs to be plugged into any irrational interaction. There is no one
13  correct way to the end goal of de-escalation. There are no known phrases or techniques that force a
14  subject to de-escalate their actions and behaviors.  It is known that for de-escalation tactics to be
15  effective, both parties must be willing and able to participate in the process.

16       The false premise that some operate from is that anyone can be de-escalated if an officer
17  chooses to utilize a de-escalation tactic. Taking that false premise to the next degree, those same people
18  would then claim that if the person was not de-escalated, then the officer in question simply and/or
19  purposely chose not to, or neglected to, utilize a well-established and proven de-escalation tactic.

20       It must be clearly noted that the situation at this point was primarily being driven by the actions
21  and behaviors of Glover and the officers were reacting to such actions and behaviors.

22       There is no evidence in the record to show that another type of de-escalation tactic would have
23  caused a change in Glover's behavior or willingness to participate in the de-escalation process or would
24  have eventually complied with the officers' verbal directions. In fact, there are several indications in the
25  record that Glover would not have and that the officers would have had to resort to physical force.

26       It is my professional opinion that Glover demonstrated that he was not willing to participate in
27  any de-escalation efforts.

28       Officers are trained that when they are confronted with a reasonably perceived life-threatening
29  threat, that they need not experiment with lesser intrusive options.

30       Mr. Clark writes, "There were two Officers involved in the incident and only one of the Officers
31  used any form of force. As can be seen below, Officer Avila (who never had the bushes blocking his view)
32  had not even drawn his firearm by the time Mr. Glover reached the gate."

33       The screenshot provided by Mr. Clark shows Avila's right hand obscured by his body. This
34  appears to have been done intentionally to support Mr. Clark's incorrect conclusion or a matter of
35  carelessness on Mr. Clark's part. Another screenshot captured at the same timestamp clearly shows that
36  Aguila had his gun drawn prior to the OIS.

5

**Edward T. Flosi, M.S.**
Justitia Consulting, Inc.



1

2   Mr. Clark fails to recognize the fact that two people at the same location can observe and
3   perceive different facts and circumstances based on their relative positioning and where there focal
4   attention is directed.

5   In conclusion of this section, Mr. Clark writes, "Key known facts that should have determined
6   Officer Higareda's actions includes:
7   • Mr. Glover was alone.
8   • Mr. Glover was moving away from the Officers.
9   • Mr. Glover was shot in the back.
10  • Mr. Glover did not physically harm anyone.
11  • Mr. Glover did not verbally threaten anyone.
12  • Mr. Glover never appears to point a gun at any Officer.
13  • Officer Higareda had several less lethal and less intrusive alternative options available to
14      him.
15  • Officer Higareda did not give a verbal warning."

16  The fact that Glover was alone is irrelevant.

17  Glover was indeed running away from the officers when the shot was fired.

18  Glover was indeed shot in the back.

19  It is not a necessary element to wait until harm as actually been done prior to responding with
20  reasonable deadly force.

21  It is not a necessary element for the subject to verbally threaten anyone prior to responding
22  with reasonable deadly force. Pointing a gun in the officers' direction is enough of a threat without
23  Glover saying anything.

6

**Edward T. Flosi, M.S.**
Justitia Consulting, Inc.

1    It is unclear to me how Mr. Clark can simply reject the perceptions of Higareda and the body
2    position of Glover as captured by video at the time that Higareda said he perceived that Glover had
3    pointed the gun in his direction.

4    Mr. Clark fails to provide a list of other available and feasible options to stop a perceived
5    imminent threat of serious bodily injury or death. Again, officers are trained that when they are
6    confronted with a reasonably perceived life-threatening threat, that they need not experiment with
7    lesser intrusive options.

8    As previously stated, a full verbal warning was not feasible in my professional opinion based on
9    Glover's actions and behaviors.

10    <u>Standards and Training Regarding the Use of Deadly Force (pp. 11)</u>

11    Mr. Clark cites California POST Basic Academy Workbook Learning Domain 2 – Criminal Justice
12    System (LD2). It is noted that this learning domain is delivered very early in the academy cycle and prior
13    to  California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation (LD20).

14    While LD2 casually mentions the use of deadly force one time in the entire workbook, this
15    learning domain does not contain curriculum regarding the training standards of the use of deadly force.
16    Those training standards are contained within LD20.

17    <u>POST Re-evaluation of Force Requirement (pp. 11)</u>

18    This appears to be a copy/paste of basic training material. No commentary is needed.

19    <u>Considerations Regarding the Use of Deadly Force (pp. 11-13)</u>

20    Mr. Clark then mostly outlines some law enforcement training standards in this section. It must
21    be noted that Mr. Clark has been retired for several years and training in this area has significantly
22    changed since Mr. Clark was responding to calls for service and using any force options.

23    Mr. Clark is not a POST certified Basic Academy Instructor. In order to teach California POST Basic
24    Academy Learning Domain 20 (Use of Force), he would have had to have completed a 40-hour Academy
25    Instructor Certification Course, which I am confident he has not.

26    I have completed the 40-hour Academy Instructor Certification Course and have taught Learning
27    Domain 20 on several occasions. I have been involved in developing training curriculum for Learning
28    Domain 20 as well.

29    It must be noted that merely reading the learning domain workbook is insufficient to understand
30    how the learning domain is taught. The workbook is a study guide given to recruits to support the
31    learning. To have a full understanding, one must; (1) be an instructor for the learning domain, (2) review
32    the instructor's lesson plan, or (3) attend a presentation of the learning domain. To my knowledge, Mr.
33    Clark has not attended an LD20 presentation in order to be able to opine on how things are taught.

34    It is therefore unlikely that Mr. Clark has a full understanding of the recent training other than
35    from reading related materials.

7

**Edward T. Flosi, M.S.**
Justitia Consulting, Inc.

1    In March 2021, California POST Basic Academy Workbook Learning Domain 20 v5.3 (July 2020)
2    was the active version.

3    Mr. Clark writes, "The use of deadly force is the most serious decision a peace officer may ever
4    have to make. Such a decision should be guided by the reverence for all human life (including the
5    officer's life and others that may be in imminent danger) and used only when other means of control are
6    unreasonable or have been exhausted."

7    The phrase "used only when other means of control are unreasonable or have been exhausted"
8    does not appear in the version of the workbook that was active at the time. This phrase was commonly
9    misunderstood to mean that an officer must try – and exhaust – all  other force options prior to
10   responding with deadly force. That has never been part of the curriculum.

11   Mr. Clark writes, "An officer may use deadly force to protect oneself or others when the officer
12   has the objective and reasonable belief that his/her life, or the life of another, is in immediate danger of
13   death or serious physical injury based upon the totality of the facts known to the officer at the time. (LD
14   20: Chapter 3 – Use of Deadly Force, pages 4-3 & 4-4.)"

15   The language in Mr. Clark's report is not what the workbook reads. The citation is from chapter 4
16   and reads, "A peace officer is justified in using deadly force upon another person only when the officer
17   reasonably believes, based on the totality of the circumstances, that such force is necessary. (Penal Code
18   Section 835a(c))."

19   The workbook continues, "A peace officer is justified in using deadly force upon another person
20   only when the officer reasonably believes, based on the totality of the circumstances, that such force is
21   necessary… to defend against an imminent threat of death or serious bodily injury to the officer or to
22   another person. (Penal Code Section 835a(c)(1)(A))."

23   Mr. Clark omits in his report that there is another set of guidelines that an officer may use deadly
24   force. This section is outlined in the California POST Basic Academy Workbook Learning Domain 20 v5.3
25   (July 2020) starting on page 4-5 and titled, "Use of deadly force on a fleeing person."

26   This standard is outlined in my original Rule 26 report.

27   Mr. Clark writes, "Also, peace officers are trained not to overreact when using force, including
28   deadly force, and an overreaction in the use of force is excessive force."

29   This is not entirely accurate. While overreacting and underreacting are discussed as part of the
30   curriculum, the officers are more accurately trained on how to properly respond in force encounters.

31   Force Options (pp. 13-14)

32   Mr. Clark then mostly outlines some law enforcement training standards in this section.

33   Mr. Clark writes, "Under the facts cited above, Mr. Glover never harmed any person, never
34   verbally threatened to harm any person, and Mr. Glover's conduct was not life-threatening to any
35   person or officer at the time of the deadly force."

8

**Edward T. Flosi, M.S.**
Justitia Consulting, Inc.

1   I disagree with this statement as Higareda's perception – and the video evidence – appears to
2   support the fact that at one point during Glover's flight, Glover did point the gun in Higareda's direction.
3   Pointing a gun at an officer would make Glover a life-threatening threat.

4   Mr. Clark writes, "Instead, Officer Higareda overreacted in the use of deadly force by shooting a
5   fleeing subject in the back." This is a conclusionary statement  that only the jury can determine.

6   <u>The Required (and Trained) Tactical Response to this Incident (pp. 15-17)</u>

7   Certain tactics are never "required" to be used. The tactics used will be considered on a case-by-
8   case basis depending on the facts and circumstances at the time. There is no playbook that officers must
9   follow.

10   Mr. Clark writes, "A seminal aspect of this incident was the gross departure from required
11   tactics, which resulted in the death of Mr. Glover."

12   I disagree with this statement. Mr. Clark then recites several tactical considerations that could
13   be applied if the situation allowed. These tactics could be applied when dealing with a non-life-
14   threatening threat. There is no requirement that officers go through these steps if they reasonably
15   believe that they are confronting a life-threatening threat.

16   Mr. Clark uses the term "decompression" as one of the "required" and "trained" tactical
17   responses. I am unaware of any California POST training material that uses this term in regards to this
18   type of situation. Also, I am unaware of any California POST training material that describes this term I
19   the manner that Mr. Clark does. This appears to be a personal standard of Mr. Clark.

20   **Rebuttal to Mr. Clark's Specific Opinions (pp. 17-23)**

21   The rebuttal opinions are based upon my initial review of the documents as presented to me by
22   the defense counsel and other evidence related to this incident. My findings and opinions are formed
23   from: (1) the totality of facts and circumstances known/perceived by the officers, (2) my own training
24   and experience, (3) California POST standards, and (4) what the appropriate reactions would have been
25   from an officer when presented with similar circumstances, based upon their law enforcement and
26   other related professional training and experience.

27   I reserve my right as expert to alter, amend, enhance, or delete my findings and opinions as
28   necessary following my review of any additional discovery in this case.

29   Based on the totality of my training, education, and experience in law enforcement; as a law
30   enforcement trainer; as a criminal justice educator; and, as a police practices consultant, I have
31   developed the following rebuttal opinions to a reasonable degree of professional certainty in the field of
32   law enforcement practice.

33   <u>Mr. Clark's Opinion #1: "Officer Higareda's use of deadly force was inappropriate and unnecessary under</u>
34   <u>the totality of the circumstances, was inconsistent with basic law enforcement training and violated</u>
35   <u>basic POST standards and the standard of care pursuant to POST and officer training."</u>

36   I disagree with this opinion as stated in my original Rule 26 report.

**Edward T. Flosi, M.S.**

Justitia Consulting, Inc.

1       Mr. Clark writes, "Accordingly, Officers are to use lethal force always with a reverence for life
2    and only in the direst of circumstances and only absent an obvious reasonable alternative."

3       There is no such California POST standard of "only absent an obvious reasonable alternative."
4    This is a Mr. Clark personal standard that is not taught in the LD20 curriculum. Officers are trained that
5    they need not experiment with lesser levels of force if the facts and circumstances known or reasonably
6    perceived support/justify a deadly force response.

7       This "obvious reasonable alternative" theory does not reconcile with the fact that officers need
8    not experiment with lesser levels of force if the facts and circumstances known or reasonably perceived
9    support/justify a deadly force response.

10      Mr. Clark writes, "In the case of deadly force, an officer may not use deadly force if there is not
11   an imminent threat of great bodily harm or death against him or someone else."

12      Mr. Clark omits the second training guideline of the "Use of deadly force on a fleeing person."

13      Mr. Clark writes, "Based on my review of the materials, no reasonable officer would have
14   perceived Mr. Glover pointing a gun at any person."

15      This appears to be an attack on Higareda's credibility as that is exactly what Higareda perceived.

16      Mr. Clark writes, "No gun can be identified in Mr. Glover's hand at any time in any video that
17   would suggest pointing it at another person. No gesture or furtive movement can be seen at any time in
18   any video that would suggest pointing a weapon at any person."

19      It must be noted that BWV is commonly blurry and pixelated when movement is involved
20   whereas the human eye does not suffer this effect. There are other factors that tend to show that
21   Glover had a gun in his hand during his flight:
22           •   The gun was found near to where Glover fell.
23           •   The gun does appear to be captured in video in Glover's right hand  just before the OIS.

24      Mr. Clark writes, "The evidence shows that Mr. Glover tripped over plants at the time that
25   Defendants claim the pointing of a gun occurred."

26      This is a conclusionary statement and does not consider the perceptions of Higareda at the time.

27      Mr. Clark writes, "However, Officer Higareda stated that he lost sight of Mr. Glover during that
28   time. Therefore, even a subjective belief that a person is pointing a gun rather than tripping over plants
29   does not appear to have been perceived by Officer Higareda."

30      I do not believe this is an accurate representation of the timeline as perceived by Higareda. It is
31   my understanding that Higareda saw the gun initially as Glover was getting out of the car. Higareda
32   momentarily lost sight of Glover but regained visual as Higareda saw the pointing of the gun in
33   Higareda's direction.

34      Mr. Clark writes, "Mr. Glover is merely running away."

**Edward T. Flosi, M.S.**

Justitia Consulting, Inc.

1    This is a dramatic oversimplification of what the totality of facts and circumstances were as
2    known/perceived by Higareda at the time of the force response. More accurately, Higareda perceived
3    that Glover was running away after Glover had pointed a gun in Higareda's direction.

4    Mr. Clark writes, "Officers, including Officer Higareda, are trained and know that they cannot
5    shoot a person merely for fleeing and they cannot shoot a person merely for having a gun in their hand."

6    This is generally true if there are no other facts and circumstances involved, such as described in
7    the training guideline of the "Use of deadly force on a fleeing person."

8    Mr. Clark writes, "it is more likely that this incident is a result of Officer Higareda overreacting
9    and using unnecessary force than reacting to an actual perceived threat."

10    Mr. Clark again appears to be drawing a conclusion that is reserved as the province of the jury.

11    Mr. Clark writes, "Important to my review is that Mr. Glover was not being aggressive or
12    combative with any person at the time of the use of deadly force, Mr. Glover did not verbally threaten
13    to harm any person, and Mr. Glover did not verbally or physically display and intention to assault any
14    officer or person."

15    I disagree that Glover was not aggressive or combative based on the perceptions of Higareda.
16    Pointing a gun in the direction of an officer would appear to be an aggressive, combative and life-
17    threatening action.

18    It is not necessary that the subject make a verbal threat while pointing a gun at an officer or to
19    wait until actual harm has happened.

20    Mr. Clark writes, "Officer Higareda had reasonable, less-intrusive, alternatives to the use of
21    deadly force."

22    This appears to go towards his previous writing about the "required" and "trained" tactical
23    responses. Again, officers are trained that they need not experiment with lesser levels of force if the
24    facts and circumstances known or reasonably perceived support/justify a deadly force response.

25    Mr. Clark fails to provide any proof that any of his suggested tactics would have been effective
26    in stopping Glover's life-threatening actions and behaviors.

27    Mr. Clark writes, "Officer Higareda was not responding to a serious or violent crime at the
28    initiation of his contact with Mr. Glover."

29    This comment is irrelevant as described earlier, sworn peace officers are allowed to make
30    personal observations of illegal activity – violent or not – on their own without the assistance of the
31    public.

32    Mr. Clark writes, "Due to the minor infraction involved in the beginning of this incident, the law
33    enforcement officers' interest in stopping and detaining Mr. Glover is greatly diminished."

34    Mr. Clark appears to be writing about the parking violation. Mr. Clark omits several other
35    important factors that were apparent after the observation of the parking violation and prior to the
36    vehicle pursuit.

**Edward T. Flosi, M.S.**

Justitia Consulting, Inc.

1          Mr. Clark even appears to admit that the interest was not completely absent.

2          Mr. Clark writes, "This was not a situation that constituted requiring split-second judgments by

3   Officer Higareda."

4          Mr. Clark appears to not understand that this guideline can best be placed in this situation to

5   Higareda's decision to respond with deadly force from the moment that he perceived Glover pointing

6   the gun back towards Higareda to the OIS. This time frame to make that decision would be very short

7   and within a split second.

8          Mr. Clark appears to believe that there was time for the officers to have a tactical huddle to

9   discuss the situation while an armed subject fled into the residential neighborhood unsurveilled.

10          Even if Higareda had stopped to use the parked vehicle as partial cover, there would be no way

11   to not expose Higareda's head and other body parts from being struck by a bullet fired from Glover's

12   gun.

13          Officers are well informed of the problems with gun violence. It would be a dereliction of duty to

14   simply stand back and hide completely behind cover and allow an armed subject to run away and escape

15   into a residential neighborhood.

16          In my professional opinion, it would have been an act of cowardice for an officer to have fully

17   hidden behind the parked vehicle while Glover was moving towards Aguila's perceived position and also

18   thereby allowing an armed subject to possibly disappear into the neighborhood.

19          Mr. Clark writes, "Officer Aguila did not even draw his firearm, much less use it, until

20   approximately after Officer Higareda fired his shot. This tends to show that a reasonable officer would

21   not perceive Mr. Glover as a threat."

22          This is demonstrably false.

23   <u>Mr. Clark's Opinion #2: "Officer Higareda's tactics were inappropriate under the totality of the</u>

24   <u>circumstances, were inconsistent with basic law enforcement training and violated basic POST standards</u>

25   <u>and the standard of care pursuant to POST and officer training."</u>

26          I disagree with Mr. Clark's opinion as stated above. It is my professional opinion that the tactics

27   used by the officers were consistent with current law enforcement training and practices.

28          Mr. Clark writes, "Officer Higareda failed to establish an incident specific tactical plan and failed

29   to follow the trained default tactical plan for containing and communicating with a subject."

30          The amount of time from the initiation of the vehicle pursuit to the OIS was about 50 seconds.

31   There would be no possible way to anticipate every plausible result of the pursuit in order to be able to

32   establish a "specific tactical plan."

33          The amount time from when Glover began his flight on foot to the OIS was less than 5 seconds.

34   Based on the immediate need to attempt to apprehend an armed subject prior to allowing that subject

35   to disappear into a residential neighborhood, it would not allow time to have a tactical huddle to

36   establish a "specific tactical plan."

**Edward T. Flosi, M.S.**

Justitia Consulting, Inc.

1    Mr. Clark writes, "Officer Higareda failed to de-escalate the situation, and instead inappropriatly
2    [sic] escalated the situation leading to his use of inappropriate and unnecessary force as defined by
3    POST."

4    My comments on de-escalation are documented earlier in this report.

5    Mr. Clark writes, "Officers should use (as trained) the equation Distance + Cover = Time, which
6    allows officers to communicate with the subject, refine tactical plans, and call for additional resources –
7    this did not occur here."

8    I agree that this formula is a valid tactical consideration when the situation and subject allow for
9    such considerations. I also agree that this did not happen due to the actions and behaviors of Glover not
10   allowing the officers to apply these considerations.

11   This incident took place over a short time period and involved an armed subject that was fleeing
12   first in a vehicle and then on foot towards a residential neighborhood.

13   Again, Officers are well informed of the problems with gun violence. It would be a dereliction of
14   duty to simply stand back and hide completely behind cover and allow an armed subject to run away
15   and escape into a residential neighborhood.

16   In my professional opinion, it would have been an act of cowardice for an officer to have fully
17   hidden behind the parked vehicle while Glover was moving towards Aguila's perceived position and also
18   thereby allowing an armed subject to possibly disappear into the neighborhood.

19   Mr. Clark's Opinion #3: "Based on my review of the record, Deputy Higareda violated LAPD training and
20   policies and violated POST standards, which reflects his lack of adequate training, and a direct reflection
21   of LAPD's inadequate supervision, and training policies. I also noted that LAPD officials, ignoring the
22   objective evidence as I have described above, ratified, and approved Officer Higareda's use of
23   inappropriate and unnecessary deadly force."

24   I disagree with Mr. Clark's opinion as stated above.

25   As stated in my original Rule 26 report, "Taking into consideration the facts and circumstances
26   observed and perceived by Higareda prior to and at the time of the deadly force response (as detailed in
27   the section titled, "Details of the Incident"), and based on the factors listed above in this section, it is my
28   professional opinion that the deadly force response by Higareda was appropriate and reasonable to; (1)
29   prevent a perceived imminent and credible threat of serious bodily injury or death, and (2) to prevent
30   the escape of a fleeing subject that had threatened Higareda with a firearm – probable cause to believe
31   that the subject had committed a crime involving the infliction or threatened infliction of serious
32   physical injury or death –  and that subject poses a threat of death or serious physical harm, either to
33   the officer or others if allowed to escape. The deadly force response by Higareda was appropriate and
34   consistent with current law enforcement training standards in consideration of the "totality of
35   circumstances" presented to him at the moments deadly force was used."

36   In my review of the LAPD Use of Force policy, I find the policy to be adequate and consistent
37   with California POST training and standards.

13

**Edward T. Flosi, M.S.**

Justitia Consulting, Inc.

1       Due to this consistency between California POST training standards and LAPD policy, it would be
2  my professional opinion that the officers did not violate LAPD policy based on the facts and
3  circumstances known/perceived to them at the time of this incident.

4       Mr. Clark provides no specific evidence that Higareda and/or Aguila were; (1) inadequately
5  trained, or (2) inadequately supervised.

6       Mr. Clark believes that the LAPD officials ignored Mr. Clark's "objective evidence" described in
7  his report. It is my understanding that the LAPD conducts a thorough and independent investigation of
8  all officer involved shootings with a non-involved team of specifically trained officers.

9       The findings of this investigation are then forwarded to the Los Angeles Board of Police
10  Commissioners for their final findings.

11       I would so testify to the aforementioned findings and opinions under penalty of perjury if called
12  upon in any subsequent civil proceedings. Signed under penalty of perjury in accordance with the laws
13  of California and of the United States on August 11, 2023, in Fullerton, California.

14  Respectfully submitted,

15

16  Edward T. Flosi, M.S.
17  Justitia Consulting, Inc.