# "EXHIBIT A"

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


| | |
|---|---|
| NATHAN ROCKY GLOVER, | ) |
| | ) |
| Plaintiff(s), | ) |
| | ) |
| vs. | )CASE NO. 2:21-cv-09915- |
| | )        FWS-ASx |
| CITY OF LOS ANGELES; | ) |
| ALEJANDRO HIGAREDA; JUAN | ) |
| AGUILA; and DOES 1-10, | ) |
| inclusive, | ) |
| | ) |
| Defendant(s). | ) |
| _____ | ) |


DEPOSITION OF SHARON K. KAWAI, M.D.

TAKEN ON

THURSDAY, AUGUST 24, 2023


SAMANTHA PAOLETTO, CSR NO. 11393

1               UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3

4    NATHAN ROCKY GLOVER,        )
                                 )
5            Plaintiff(s),       )
                                 )
6    vs.                         )CASE NO. 2:21-cv-09915-
                                 )          FWS-ASx
7    CITY OF LOS ANGELES;        )
     ALEJANDRO HIGAREDA; JUAN    )
8    AGUILA; and DOES 1-10,      )
     inclusive,                  )
9                                )
             Defendant(s).       )
10   _____)

11

12

13

14   The Zoom deposition of SHARON K. KAWAI, M.D., taken by

15   the Defendants, CITY OF LOS ANGELES, ALEJANDRO

16   HIGAREDA, and JUAN AGUILA, in the City of Chino, State

17   of California, commencing at 1:00 P.M., THURSDAY,

18   AUGUST 24, 2023, before SAMANTHA PAOLETTO, CSR

19   No. 11393, for the State of California, pursuant to

20   notice.

21

22                      ---o0o---

23

24

25
                                                        2

1    **A P P E A R A N C E S:**

2

3    FOR THE PLAINTIFF NATHAN ROCKY GLOVER:
         LAW OFFICES OF DALE K. GALIPO
4        21800 BURBANK BOULEVARD, SUITE 310
         WOODLAND HILLS, CALIFORNIA 91367
5        818-347-3333
         BY: MARCEL F. SINCICH, ATTORNEY AT LAW
6            MSINCICH@GALIPOLAW.COM

7

8    FOR THE PLAINTIFF NATHAN ROCKY GLOVER:
         LAW OFFICES OF GREGORY A. YATES
9        16830 VENTURA BOULEVARD, SUITE 250
         ENCINO, CALIFORNIA 91436
10       310-858-6944
         BY: GREGORY A. YATES, ATTORNEY AT LAW
11           GYATES@GREGORYAYATES.NET

12

13   FOR THE DEFENDANTS CITY OF LOS ANGELES, ALEJANDRO
     HIGAREDA, and JUAN AGUILA:
14       BURKE, WILLIAMS & SORENSEN, LLP
         444 SOUTH FLOWER STREET, SUITE 2400
15       LOS ANGELES, CALIFORNIA 90071
         213-236-0600
16       BY: NATHAN A. OYSTER, ATTORNEY AT LAW
             NOYSTER@BWSLAW.COM

17

18

19

20

21

22

23

24

25

3

**I N D E X**

WITNESS                                                  PAGE

SHARON K. KAWAI, M.D.

    Examination by MR. OYSTER                        6
    Examination by MR. SINCICH                      56

INFORMATION REQUESTED

None

DOCUMENT REQUESTED

None

QUESTION WITH AN INSTRUCTION NOT TO ANSWER

None

**E X H I B I T S**

EXHIBIT                    DESCRIPTION                  PAGE

None

4

```
 1                    CHINO, CALIFORNIA

 2              THURSDAY, AUGUST 24, 2023

 3                      1:00 P.M.

 4                      --o0o--

 5

 6           THE COURT REPORTER:  Good afternoon.  I'm

 7   Samantha Paoletto, and I am your code reporter today.

 8   We are now on the record.  The time is 1:00 p.m.

 9           We are here for the Zoom deposition of

10   Nathan Rocky Glover versus City of Los Angeles, et

11   al., Case No. 2:21-cv-09915-FWS-ASx.

12           Counsel, please state your appearance.

13           MR. SINCICH:  Marcel Sincich for the

14   plaintiff.

15           MR. OYSTER:  Nathan Oyster for defendants.

16           THE COURT REPORTER:  Dr. Kawai, please raise

17   your right hand.

18           Do you solemnly swear the testimony you will

19   give in this proceeding shall be the truth, the whole

20   truth, and nothing but the truth, so help you God?

21           THE WITNESS:  I do.

22           THE COURT REPORTER:  Please state your name

23   and spell it for the record.

24           THE WITNESS:  My name is Sharon Kay Kawai,

25   S-h-a-r-o-n; middle name K-a-y; last name Kawai,
```

5

1    K-a-w-a-i.

2              THE COURT REPORTER:  Thank you.

3              THE WITNESS:  You're welcome.

4

5                   SHARON KAY KAWAI,

6         having first been duly sworn, was

7         examined and testified as follows:

8

9                     **EXAMINATION**

10   BY MR. OYSTER:

11             Q    Good afternoon, Dr. Kawai.

12             A    Good afternoon.

13             Q    As I introduced myself before we

14   started, my name is Nathan Oyster.  I represent the

15   defendants in the lawsuit that has been filed by

16   Mr. Glover, and I am here today to take your

17   deposition over Zoom.

18             Have you ever provided deposition testimony

19   prior to today?

20             A    Yes.

21             Q    On how many occasions?

22             A    I would say since mid 1995 more than

23   350 depositions.

24             Q    And you feel sufficiently comfortable

25   with the process for a deposition that I can skip

                                                    6

```
 1   explaining that?

 2            A     Yes.

 3            Q     Okay.  And I understand that you've

 4   been retained as an expert witness in this case; is

 5   that correct?

 6            A     That's correct.

 7            Q     And who retained you as an expert

 8   witness?

 9            A     I have a letter of retention here

10   dated May 30th, twenty -- May 30th, 2023, and signed

11   by Alejandro Mongula, M-o-n-g-u-l-a; and so attorney

12   Marcel -- I'm gonna butcher the last name --

13   S-i-n-c-i-c-h.

14            Q     And you were retained by Mr. Galipo's

15   office; correct?

16            A     Correct, yes.

17            Q     And you were asked to take a look at

18   the case; is that correct?

19            A     Yes.

20            Q     And you eventually formed some

21   opinions; is that correct?

22            A     Yes.

23            Q     And then you eventually prepared a

24   report; is that correct?

25            A     That's correct.
```

1          Q      Have you completed all of the work
2    that you expect to perform on this case as of now?
3          A      If it's due for trial, yes, if it's
4    coming up soon.
5          Q      And is there any reason why you would
6    not be able to give your best possible deposition
7    testimony today?
8          A      No.
9          Q      And in this case you prepared a
10   written report about a month ago; is that right?
11         A      Correct.
12         Q      And during the deposition, I'm gonna
13   ask you some questions about your report.  Do you
14   have a copy there handy with you?
15         A      Yes, I have.
16         Q      And if -- we're gonna go over some of
17   the information in the report.  Will it be easier for
18   you if I put it on the screen, or will it be easier
19   for you if you just look at what's in front of you?
20         A      I can look at what's in front of me.
21         Q      Okay.  And if there's anything that
22   you need to take a look at during the deposition,
23   please feel free to do so; but I'd ask that you let
24   me know what it is that you are taking a look at.  Is
25   that okay?

                                                    8

1          A       That's fair.  Absolutely.

2          Q       And just in terms of that, what do you

3      have with you today, let's say, within arm's reach?

4          A       I have a copy of the notes I took when

5      I interviewed Nathan Glover May 31, 2023; I have a

6      copy of the life care plan I formulated for --

7      specifically for Nathan Glover; I have a per life

8      expectancy, a study of the -- University of

9      Birmingham, Alabama, a study they did on what I used

10      as a guide in projecting life expectancy for

11      Mr. Glover; and I have a copy of what I reviewed; and

12      a copy of the letter of retention.

13          Q       Thank you.  In this particular case,

14      what were you asked to take a look at by Mr. Galipo's

15      office?

16          A       So I was sent -- let me find that -- a

17      flash drive, which included medical records in

18      regards to Mr. Glover from Health Services Los

19      Angeles County; from Los Angeles City Fire

20      Department; from LAC+USC Medical Center; from Rancho

21      Los Amigos Rehabilitation Center; from California

22      Department of Public Health; from Miracle,

23      M-i-r-a-c-l-e; Home Health Care manager notes; a

24      dental outpatient provider note; emergency department

25      note; and photographs of some pressure sores that

                                                    9

1      Mr. Glover sustained.

2              Q       And what did you understand your

3      assignment to be when you were first contacted?

4              A       I think to review the medical records,

5      do a Zoom interview with a Nathan Glover in order

6      to -- and use my 40 years of clinical experience in

7      projecting what Nathan Glover's rehabilitation needs

8      will be now and over his lifetime subsequent to

9      injuries he sustained March 19, 2021.

10             Q       And in determining what his future

11     medical needs will be, is that commonly referred to

12     as a "life care plan"?

13             A       Yes.  In litigation we call it a life

14     care plan, correct.

15             Q       Now, can you tell me how you're

16     currently employed?

17             A       I'm self-employed as a physician.  I

18     have -- my office is in Newport Beach.  I see

19     patients anywhere from 50 to 55 hours a week.  I do

20     expert witness work anywhere from 10 to 15 hours a

21     week.

22             Q       What type of medical work do you do as

23     a physician?

24             A       So as a board certified in physical

25     medicine and rehabilitation, probably about

                                                          10

1    70 percent of my practice involves caring for

2    patients who sustained traumatic and nontraumatic

3    brain injury; about 30 percent spinal cord injury,

4    could be tetraplegics, paraplegics; and then there

5    would be some patients who have sustained multiple

6    orthopedic injuries.

7            Q    And let's talk about spinal cord

8    injuries specifically for the moment.  In a typical

9    week you spend 50 to 55 hours a week with patients in

10   general; is that correct?

11           A    Correct, yes.

12           Q    In a normal week about how many of

13   those hours are spent with patients who have suffered

14   spinal cord injuries?

15           A    It may vary, but on an average in a

16   week, probably about five spinal cord injuries.

17           THE WITNESS:  Oh, I've lost you.  Oh, there

18   you are.

19           MR. OYSTER:  Something happened to my

20   computer.  I apologize.  I'm not sure what happened.

21   Would you mind if we go off the record and I just

22   reboot because something crazy happened here?

23           MR. SINCICH:  No.

24           MR. OYSTER:  Can anybody hear me?

25           THE WITNESS:  Yes.

                                                      11

```
 1              MR. SINCICH:  Yeah.  Are we off the record?

 2                   (Recess taken.)

 3              MR. OYSTER:  Back on the record.

 4     BY MR. OYSTER:

 5              Q     Dr. Kawai, so in a normal year, you

 6     are treating quite a few patients with spinal cord

 7     injuries?  Is that accurate?

 8              A     Yes.

 9              Q     And are there different level -- well,

10     strike that.

11              Are there different types of spinal cord

12     injuries that you treat patients with?

13              A     I would say -- you mean as to ideology

14     or the cause of their spinal cord injury?

15              Q     Let me ask a better question.  Is

16     there a type of spinal cord injury that's referred to

17     as "paraplegia"?

18              A     Yes.

19              Q     And what is paraplegia?

20              A     Paraplegia is when the patient has

21     normal function of their arms but they have loss of

22     sensation -- if they are a complete para -- they have

23     loss of sensation and motor movement in the --

24     usually the abdominal muscles and the legs or lower

25     extremities.
```
                                                           12

```
 1          Q    And is there something referred to as
 2     "quadraplegia"?
 3          A    Yeah.  We say "tetraplegia" just to
 4     keep the language, you know, Greek, not messing up
 5     the Greek, you know, Latin.  But quadraplegic or
 6     tetraplegic would be someone who with a spinal cord
 7     injury is in the cervical spine where they have
 8     weakness, loss of motor function, and sensation in
 9     their upper extremities or their arms as well as
10     below that.
11          Q    And so when you use the term
12     tetraplegia, that is -- means the exact same thing as
13     if someone was used to hearing the term quadraplegia?
14          A    Correct.
15          Q    And other than tetraplegia or
16     paraplegia, are there any other levels of severity
17     for a spinal injury?
18          A    Well, there's incomplete paraplegic
19     and there's incomplete tetraplegic.  So they may have
20     a compromise but not total loss of function in the
21     spinal cord.
22          Q    And so within the category of
23     paraplegia, there is complete paraplegia and
24     incomplete paraplegia?
25          A    Correct.
```

13

1          Q      And what is the difference between

2     complete paraplegia and incomplete paraplegia?

3          A      Well, an incomplete paraplegia can be

4     some sensory sparing below the level of the lesion in

5     the spinal cord injury, level of the spinal cord.

6     There may also be some motor sparing.  So, for

7     example, you could have a patient who say maybe

8     paralyzed in one leg but has partial function in the

9     other leg.

10          Q      And is complete paraplegia a more

11     severe injury than incomplete paraplegia?

12          A      It usually is, yes.

13          Q      With complete paraplegia, is there any

14     ability for a patient to regain motor function below

15     the level of the spinal injury?

16          A      Currently there is no treatment

17     available.  That's not considered experimental.

18          Q      With incomplete paraplegia is there

19     the potential that the patient could regain at least

20     some motor function below the level of the spinal

21     injury?

22          A      Yes.  If there's some motor sparing,

23     they have more potential.  For example, they may be

24     able to ambulate with assistive device and

25     appropriate bracing, but they may -- in most of my

                                                          14

1     patients, even if they are incomplete paras, they

2     will prefer to use a wheelchair for what we call

3     "community mobility."

4          Q    And if someone has incomplete

5     paraplegia, how would that patient go about regaining

6     some of the motor skills?

7          A    Usually we would have them work in

8     physical therapy outpatient basis.  We'll do some --

9     hook them up to muscle electrostimulation and also

10    have them work on different devices where we put them

11    up in a harness and, with the therapist, usually two

12    therapists, have them work on ambulation with support

13    being in the harness.  I think probably what's even

14    more important for incomplete paraplegias, many of

15    them can regain function of -- control of their

16    urinary tract and their bowels.

17         Q    So for a patient with incomplete

18    paraplegia, what would be the rehabilitation plan to

19    attempt to regain control function of the bladder or

20    bowels?

21         A    We would have a urologist on board

22    with the physical medicine rehab physician, and

23    together we would -- the urologist usually will be

24    urodynamics, or sometimes it will be done in a rehab

25    setting with a physical medicine rehab doctor may do

15

1    it, urodynamics, to see how the urinary sphincter is

2    coordinating with the detrusor or the wall muscle in

3    the bladder, the bladder wall muscle, and that will

4    give us information about what kinds of medication we

5    can use.  And we'll do a fluid restriction throughout

6    the day or at least put them on a schedule for fluid

7    intake.

8            Q    For --

9            A    And we'll do intermittent

10   catheterization.

11           Q    For patients with incomplete

12   paraplegia who initially experience, let's say,

13   problems with bladder control, what percentage of

14   those patients are able to regain bladder control

15   with rehabilitation?

16           A    It depends on the sacral innervation

17   to the bladder and the intestine.  If they have

18   sacral sparing, in those incomplete paraplegics, I

19   would say probably 75 percent of them can regain

20   control.  They may on occasion have incontinence.

21   Say, for example, if they eat spicy food or if they

22   drink too much fluid, they may not do the

23   intermittent catheterization more frequently as they

24   should.  They may have an accident or incontinent

25   episode.

                                                    16

1          Q      And for patients -- let me retract

2     that.

3                 What was the type of intervention that the

4     patients would need to have to be at that 75 percent

5     level?

6          A      They would have to be working with a

7     urologist and their physical medicine rehab

8     physician, basically.

9          Q      And I apologize.  I should of asked

10    that better.  In your last answer you described there

11    was something that would need to occur, I believe, in

12    their bladder for them to fall within the category

13    where there was a 75 percent chance.  What -- if I

14    remember your answer right, what was the thing that

15    would need to occur for that 75 percent to be

16    possible?

17         A      They have to have sacral sparing; so

18    the sacral nerve roots that go to the bladder have to

19    be intact.

20         Q      If the patient did not have sacral

21    sparing, what is the percentage chance that the

22    patient could regain urinary or bladder control with

23    a course of rehabilitation?

24         A      I don't have any patients in my

25    clinical practice.  They can stay dry by putting the

                                                          17

1    catheter in and out every few years, but they don't

2    have control because you don't have regulation of the

3    spinal cord to the bladder, and so they wouldn't be

4    able to gain control again.

5           Q     For a patient with incomplete

6    paraplegia, how would there be a determination as to

7    whether or not the patient has any sacral sparing?

8           A     Well, usually that will be picked up

9    like a facility like Rancho Los Amigos, and I'll do a

10   bulbocavernosus reflex.  And I recall he had that

11   done.  I can't recall if that was at Rancho or

12   LAC+USC Medical Center, but that reflex was not

13   present.  I think that was at Rancho.

14          Q     And with respect to patients with

15   incomplete paraplegia, some of them are able to

16   ambulate again?

17          A     Some of them.  It depends on the level

18   of -- if they are having neuropathic pain and/or

19   spasticity, that can keep them from safe ambulation.

20   So they may do some ambulation inside the house, but

21   when they are out in the community, they prefer to

22   use a wheelchair for safety, prevent falls or

23   minimize falls.

24          Q     For patients with incomplete

25   paraplegia, what percentage of those patients are

18

1    able to regain function sufficient enough that they

2    can ambulate inside the home?

3           A      I would probably say about -- it's

4    probably about 75 percent or 80 percent.

5           Q      And for patients with incomplete

6    paraplegia, based on your experience, what is the

7    determining factor between what makes a patient fall

8    into the 75 or 80 percent that is able to regain

9    function, ambulate in the home, versus the 20 to

10   25 percent that is not able to do that?

11          A      It has a lot to do with spasticity.

12   If they have severe spasticity and they've been on

13   antispastic -- antispasticity medication, that can --

14   they can have ankle clonus when they are walking,

15   which can lead to a fall.  If they have severe pain,

16   that can make it -- you know, neuropathic pain, that

17   can make it very difficult also.

18          Q      For the 75 to 80 percent of incomplete

19   paraplegia patients that are able to regain function

20   well enough to ambulate inside the home, what's the

21   range on when those patients regain those functions

22   relative to the date of injury?

23          A      Well, usually, by the time they come

24   to an inpatient rehabilitation unit and physical

25   therapy and the physical medicine rehab physician on

                                                      19

```
 1    physical examination can usually determine and have

 2    to determine if it's a complete or incomplete injury;

 3    so you would expect it in the first, you know, six

 4    months for sure.

 5            Q     And when you say "complete or

 6    incomplete injury," is that different from complete

 7    or incomplete paraplegia?

 8            A     No.  After we -- taking paraplegia, it

 9    would be complete or incomplete paraplegia.  It would

10    be noted on the physical examination.

11            Q     If we assume that a patient is an

12    incomplete paraplegic, what is the time frame for

13    when you would expect that incomplete paraplegic to

14    be able to ambulate within the home if the patient

15    was ever gonna reach that point?

16            A     Well, I would say probably within the

17    first six months.  By the six-month period, they

18    should be able to do some ambulation at home.

19            Q     And if the patient is an incomplete

20    paraplegic that has not been able to ambulate within

21    those first six months, what would be your prognosis

22    as to whether that patient is ever going to be able

23    to ambulate in the home?

24            A     In my clinical practice, I would have

25    to say most of those patients would have such severe
```

                                                        20

1    spasticity and/or pain that they probably never will

2    regain ability to be a safe ambulator at home.

3            Q       And when you're referring to

4    ambulating at home for an incomplete paraplegic, is

5    that ambulating with an assisted device?

6            A       Yes.  Usually they would have -- they

7    can use axillary crutches or a walker.

8            Q       Now, of the patients that you see with

9    spinal cord injuries in your practice, some of them

10   have tetraplegia?

11           A       Yes.

12           Q       And then some of them have complete

13   paraplegia?

14           A       Yes.

15           Q       And some of them have incomplete

16   paraplegia?

17           A       Yes.

18           Q       Of the patients with incomplete

19   paraplegia, do you have an estimate as to how many of

20   those patients live outside of a health care or

21   rehabilitation facility?

22           A       You mean long term?

23           Q       Correct.

24           A       I would say most of them go home with

25   family.

                                                           21

```
 1              Q       And would patients with tetraplegia --
 2      are some of those patients in scenarios where the
 3      long-term plan is they are either going to be in a
 4      long-term medical care or rehabilitation facility for
 5      the rest of their lives?
 6              A       No.  I mean, I have incomplete and
 7      complete paraplegics who -- most of them will be
 8      home; some of them, if they don't have family, will
 9      end up in long-term facilities.
10              Q       And let me just -- I guess let me go
11      through the categories.  Just for tetraplegia, do you
12      have an estimate of the percentage of patients that
13      you would have with tetraplegia where the long-term
14      plan is the patient will need to be in a medical care
15      or rehabilitation facility for the rest of their
16      life?
17              A       Well, in my practice I try for that
18      not to happen; so probably only about five percent
19      will have to go live in a long-term facility,
20      long-term care facility.
21              Q       And then for incomplete paraplegia,
22      that percentage would be even lower; is that correct?
23              A       Correct, yes.
24              Q       Now, for incomplete paraplegia, are
25      there patients that you have that live alone?
```

                                                        22

1          A      No, I don't think I have any that live

2     alone.

3          Q      Based on your practice, is there any

4     medical reason why a patient with incomplete

5     paraplegia would not be able to live alone?

6          A      They may not be safe with their

7     ambulation in the home.  For example, if they have

8     severe spasticity, they can have falls in the home,

9     which can lead to traumatic brain injury,

10    unfortunately, or it can lead to fracture.  Usually

11    if they fall, they will fall on the weaker side, and

12    some of that bone is more osteoporotic or osteopenic

13    where there's calcium in the bone; so they can have a

14    hip fracture.  And at that point, if they sustain a

15    hip fracture, they will be in a wheelchair the rest

16    of their lives so they won't be able to live alone.

17    We try to minimize that, of course, in rehab.

18         Q      In your practice what percentage of

19    your patients with incomplete paraplegia have in-home

20    health care workers or assistance who come to the

21    home every day?

22         A      I was looking at my patient files.

23    Usually they will have someone come in and help them

24    around the time they take a shower.  They can't wear

25    their bracing in the shower; so I'd say they would

                                                        23

1    have probably at least anywhere from four to eight

2    hours a day someone coming in.

3              Q       Four to eight hours per day?

4              A       Yes.

5              Q       And your typical patient with

6    incomplete paraplegia that does have someone come

7    into the home for four to eight hours a day -- what

8    are the things that that in-home healthcare worker

9    does?

10             A       Usually they will help assist them

11   with their bowel program, and that can take anywhere

12   from two to four hours, and then with their shower,

13   which can take about four hours.  It depends on the

14   size of the patient.  If they're having severe

15   spasticity or severe pain, you could have two people

16   assisting with the -- when they are up and about.

17             Q       When you have -- well, strike that.

18             To the best of your knowledge, in the past

19   year have you had any patients that you've treated

20   who have incomplete paraplegia and have had 24-hour,

21   around-the-clock, in-home healthcare assistance?

22             A       It depends on if they have severe

23   chronic pain and severe spasticity and what they

24   weigh, how much they weigh.

25             Q       And do you recall that being the case

                                                      24

1    with any patients that you've treated in the past

2    year?

3              A    Yes.

4              Q    About how many patients would you say

5    you've had over the past year that had incomplete

6    paraplegia and required 24-hour, around-the-clock,

7    in-home healthcare?

8              A    Probably about five to ten percent.

9    Be a minority.

10             Q    And when you say the patient's weight,

11   what is a weight that would tend to require

12   around-the-clock in-home healthcare?

13             A    Well, if they're morbidly obese or if

14   they are really tall and they have severe spasticity,

15   that makes it more difficult.

16             Q    Is there a number in terms of pounds

17   that you have in mind where kind of above that limit

18   you would require additional in-home healthcare?

19             A    No.

20             Q    In this particular case, would it be

21   accurate to say that the work that you performed was

22   reviewing the records that were provided to you and

23   then having a one-hour Zoom meeting with Mr. Glover?

24             A    Yes.

25             Q    Did you also have a conversation with

                                                    25

```
 1    Ms. Inouye?

 2            A      Oh, yes.

 3            Q      Okay.

 4            A      If I remember, she's an economist, I

 5    believe.

 6            Q      And other than that, reviewing the

 7    records, the one-hour Zoom, and the conversation with

 8    Ms. Inouye, is there anything else that you used to

 9    gain information for forming your opinions in this

10    case?

11            A      Well, my some 40 years of clinical

12    experience in treating patients with spinal cord

13    injury.  I had to use that, of course.

14            Q      And is there anything else specific to

15    this case that you reviewed other than the records,

16    the Zoom, and a conversation with Ms. Inouye?

17            A      Oh, in formulating the life care

18    plan -- oh, I do recall.  You asked me about weight.

19    The home health agencies that supply the attendant

20    care -- they have a weight limit, and when I talked

21    to them -- let me look.  I spoke to Maxim Home Health

22    in Los Angeles, and they have -- they can't handle a

23    patient -- the maximum is 150 pounds for one

24    caregiver.  If they weighed more than that, then they

25    have to have two caregivers.
```

                                                              26

1          Q      What percentage of the American
2     population for adults is under 150 pounds?
3          A      I don't know.  We've really been
4     escalating as a nation.
5          Q      I'm guessing less than a quarter of
6     the American population, male and female, is under
7     150 pounds?
8          A      Oh, gee.  You know, I haven't done any
9     research into that.  But certainly as a nation, if
10    you look at the weight per citizen, it's more than,
11    like, in your European countries and Asian countries.
12         Q      Now, the notes that you prepared --
13    were those notes that you prepared during your
14    discussions with Mr. Glover?
15         A      Yes, uh-huh.
16         Q      And then other than the notes and the
17    report that you prepared, is there any other
18    documents that you generated relating to this case?
19         A      No, I don't believe so.
20         Q      Now, with respect to Mr. Glover
21    specifically, do you have an understanding as to what
22    his medical diagnosis was?
23         A      All the medical records I looked at,
24    especially Rancho Los Amigos, they said he was a T7
25    complete paraplegia AIS-A, capital A.

                                                    27

1           Q      And so the analysis that you did was

2    based on a diagnosis that Mr. Glover was a complete

3    paraplegic; is that correct?

4           A      Yes.

5           Q      And did you have any discussions with

6    any of the physicians that treated Mr. Glover?

7           A      No, I have not.

8           Q      And have you reviewed any -- well, let

9    me back up.

10          What is the diagnostic test or tests to

11   determine if someone has a spinal injury resulting in

12   paraplegia?

13          A      Well, I think in his case he had an

14   MRI, which showed complete disruption of the spinal

15   cord.

16          Q      And have you reviewed the MRI of

17   Mr. Glover's injury?

18          A      No.  I wasn't sent the films.  I think

19   I just read the report.

20          Q      In formulating a lifecare plan for a

21   patient who has suffered a spinal injury, how do you

22   go about doing that, just in general?

23          A      In my expert work in formulating life

24   care plans?

25          Q      Yes.

                                                        28

1          A      Well, that's where the medical records

2    become very important.  My Zoom interview with

3    Mr. Glover becomes important and then my 40 years of

4    clinical practice.

5          Q      In developing a life care plan, would

6    it be accurate to see one of the things that you are

7    doing is attempting to predict what medical care the

8    patient is likely to require in the future?

9          A      Yeah.  It has to be more probable than

10   not; so 51 percent or greater that he will need it --

11   he or she will need it.

12         Q      And how do you go about determining

13   whether a patient -- whether it's more probable than

14   not that a patient will require a specific type of

15   treatment in the future?

16         A      Well, the interview with Mr. Glover

17   became very important.  The fact that he's -- he has

18   a grandmother that he lives with who's in her mid

19   '70s.  He does have a son, four-year-old son, Nathan;

20   and he has a girlfriend who's the mother of Nathan,

21   but he can't get into the girlfriend's house.

22             But he's had a history of pressure sores.

23   He had one he told me on the left butt cheek, and he

24   required surgery for that, and at the time of the

25   interview with him, he had another pressure sore on

                                                          29

1    the right butt cheek and will have to have a rotated
2    flap for that in the future.
3            And he told me about he has frequent
4    episodes of fecal and urinary incontinence.  He has a
5    fall.  He's about 25 to 50 percent help from getting
6    in and out of the wheelchair.  He requires 50 percent
7    help to the shower chair.  He has a urinary tract
8    infection about every month.  He gets what we call
9    "autonomic dysreflexia" when he gets constipated.  I
10   think he told me he has -- he has a fall out of his
11   wheelchair about every month; so monthly falls.  And
12   that's usually when he tries to get in and out of his
13   wheelchair; so during wheelchair transfers when he
14   falls.  He had a deep vein thrombus in his right leg;
15   so he was still on anticoagulants at the time of the
16   interview.
17           So falls become the danger of sustaining a
18   subdural hematoma or some kind of head injury becomes
19   a possibility when someone is on a blood thinner; so
20   the frequent falls concern me with Mr. Glover.
21           He has severe pain and severe burning all
22   the time he feels in his legs.
23           He has severe spasticity in his -- the
24   weight he told me was 190 pounds.  So I called the
25   home health agency, and that's one of the questions

                                                      30

1    they always ask, "What's the weight of the patient?"

2    when it's an adult.  And that's when they mentioned

3    the 150-pound weight limit.

4              Q    I'd like you to take a look at your

5    life care plan you prepared and specifically page 2

6    of the life care plan --

7              A    Okay.

8              Q    -- that has the heading "Out-patient

9    Medical Care."  Do you see -- do you have that in

10   front of you?

11             A    Yes, I have.

12             Q    Okay.  In that section of the life

13   care plan, you have listed a number of types of

14   out-patient medical care that, in your opinion,

15   Mr. Glover will require to varying degrees over the

16   remainder of his life; is that correct?

17             A    Yes.

18             Q    Now, when you prepare a lifecare plan,

19   is this section the same for every patient with a

20   spinal injury?

21             A    No, it depends on if -- what level the

22   injury is and if it's complete or incomplete.

23             Q    A patient with tetraplegia is likely

24   to require more out-patient medical care than a

25   patient with paraplegia.  Would you agree with that?

                                                        31

1          A     Yes, uh-huh.

2          Q     And a patient with complete paraplegia

3    is likely to require more out-patient medical care

4    than a patient with incomplete paraplegia?

5          A     Usually that's the case, yes.

6          Q     All right.  I'd like you to take a

7    look at page 3 -- actually, pages 3 to 5 of your --

8    of the life care plan that you prepared.  That's all

9    under the subheading of "Durable Medical Equipment";

10   is that right?

11         A     Yes.

12         Q     And in that section you have itemized

13   items of medical equipment that you believe

14   Mr. Glover will require over the remainder of the

15   rest of his life; is that correct?

16         A     Yes.

17         Q     And the -- that section of the life

18   care plan -- do you have a template that you start

19   with when you are dealing with a patient who has a

20   spinal injury?

21         A     No.  I mean, usually a complete para

22   would require similar durable medical equipment.

23   Some of my patients, unfortunately, have a traumatic

24   brain injury and a spinal cord injury; so they may

25   need, like, augmentative communication device; so

                                                    32

1      theirs would look different.  But I think, if they

2      are paraplegic, I don't have a template, but they

3      would require about similar pieces of equipment.

4              Q      Are there items that a tetraplegic

5      might require that a paraplegic would not require?

6              A      Yeah.  A tetraplegic -- if it's

7      complete tetraplegic, they would have, like,

8      augmentative communication.  They would have a system

9      where they could, say, turn on the lights, for

10     example, and the lights would turn on so -- because

11     they can't use their hands.

12             Q      And --

13             A      And usually --

14             Q      I'm sorry.  Go ahead.

15             A      Usually they wouldn't have an

16     ultralight manual chair.  They would just have a

17     power wheelchair with a joystick.

18             Q      Are there some items of durable

19     medical equipment that a complete paraplegic would

20     require that an incomplete paraplegic would not

21     require?

22             A      No.  I think they would require

23     similar equipment depending on their age too.

24             Q      All right.  I'd like you to take a

25     look at pages 6 and 7 of the life care plan that you

                                                           33

1    prepared.  Is that a section under the heading

2    "Diagnostic Testing"?

3              A     Yes.

4              Q     And in this area of pages 6 and 7,

5    have you outlined a number of items of diagnostic

6    testing that you believe Mr. Glover will require over

7    the remainder of his life?

8              A     Yes.

9              Q     And what is the basis for opining that

10   Mr. Glover will require these diagnostic tests over

11   the remainder of his life?

12             A     Well, for example, the urinalysis and

13   the urine culture Mr. Glover has had, according to

14   what he's told me, a urinary tract infection almost

15   on a monthly basis.  We need to cut that down.  We

16   need to reduce that to preserve renal function or

17   kidney function; so he'll need the urine cultures.

18   He'll need the urodynamics to see what's going on in

19   the bladder.  He'll need the renal ultrasound to keep

20   an eye on the kidneys.  He's at risk -- because he

21   has a neurogenic bladder, he's at risk for kidney

22   stones; so he'll need the KUB radiologic studies to

23   look for renal stones.  He's been falling, and he's

24   at risk for sustaining fracture to his lower

25   extremities; so that's why I have the radiologic

34

1    testing of the extremities on page 6.

2            On page 7, he gets frequent constipation; so

3    he'll have to have CT of the abdomen/pelvis to rule

4    out what we call "acute obstipation" or an emergency

5    blockage of the colon.  He's had deep vein thrombus

6    in his right leg; so he's at risk for having more

7    deep vein thrombi.  So that's why the venous Doppler

8    for his lower extremities.  So I think it's medically

9    probable he's going to require all that testing.

10           Q     With respect to the urinary tract

11   infection issue, have you reviewed any medical

12   records indicating that Mr. Glover has experienced

13   urinary tract infections over the past year?

14           A     Over the past year?  I don't think --

15   I haven't seen anything in the year 2023.

16           Q     Do you have any information on any

17   medical treatment that Mr. Glover has received

18   in 2020 -- let me start it again.

19           Do you have any information on any medical

20   treatment that Mr. Glover has received in 2023?

21           A     No, I don't think I've seen anything

22   from 2023.

23           Q     And let's take a look at page 8 of the

24   life care plan you prepared.  Is that under the

25   heading "Hospitalizations"?

                                                    35

1          A      Yes.

2          Q      And in that section you have included

3    a number of line items that you believe Mr. Glover

4    will require hospitalizations over the remainder of

5    his life?

6          A      Yes.

7          Q      And based on your experience, a

8    patient with tetraplegia is likely to require more

9    future hospitalizations than a patient with

10   paraplegia?

11         A      Yes.

12         Q      And would you agree that a patient

13   with complete paraplegia is likely to require more

14   hospitalizations than a patient with incomplete

15   paraplegia?

16         A      Especially if they have the sacral

17   sparing to the bladder, yes.

18         Q      On page 8 you listed the cost of

19   treatments at San Gabriel Valley Medical Center at

20   $18,264 per hospital day.  Do you see that?

21         A      Yes, uh-huh.

22         Q      And how did you calculate that number?

23         A      That was in using the American

24   Hospital -- on page 12 the American Hospital

25   directory.  I used that to look at the cost of

                                                        36

1   hospitalizations.  So San Gabriel Valley Medical

2   Center did publish that in that American Hospital

3   directory.

4            Q     Would you agree that hospitals will

5   frequently charge different rates to different

6   patients even for the same hospitalization?

7            MR. SINCICH:  Calls for speculation.

8   Incomplete hypothetical.

9   BY MR. OYSTER:

10           Q     You can answer.

11           A     Well, there have been times when I've

12   called a hospital to ask them if they will give me,

13   like, a negotiated rate for someone who is gonna pay

14   out of pocket for a hospital stay; and they will

15   usually give me a contract for that patient, which is

16   good for one month, you know, that month in the

17   future.  In other words, six months from now, they

18   won't guarantee the same negotiated rate; so, I mean,

19   there are times when they will, yes.

20           Q     In the course of your work, do you

21   ever look at medical billing records?

22           A     I have, yes.

23           Q     Based on your experience, are there

24   scenarios in which a government-run program, such as

25   Medi-Cal or Medicare, contracts with a healthcare

                                                          37

1    provider to pay a lower rate than that healthcare

2    provider might list in publicly available

3    information?

4            A     Yes.

5            Q     And in your experiences, sometimes the

6    Medi-Cal or Medicare rates -- would you agree they

7    might be as little as ten percent of the rate that a

8    hospital is listing for its daily stay?

9            A     I think -- the costs I try to use are

10    not speculative.  It's hard for me to know.  I mean,

11    when I was medical director of rehab at St. Jude,

12    every calendar year we would have to go to the table

13    and negotiate with Medicare, Medi-Cal; so every year

14    it can change, you know, what's going to be covered

15    versus what's not going to be covered, how much they

16    are going to cover it for.  So it's too speculative.

17    So in making life care plans, we're not supposed to

18    speculate.

19            Q     Okay.  I sort of have, I guess, a

20    question before that question.  So the question I

21    want to get to first is, based on your experience,

22    would you agree that the rates that some hospitals

23    accept from Medicare or Medi-Cal can be as little as

24    ten percent of what that hospital might list as their

25    daily rate on publicly available information?

                                                    38

```
1              MR. SINCICH:  Calls for speculation.
2              THE WITNESS:  Yeah.  I don't want to
3      speculate.
4      BY MR. OYSTER:
5              Q     I'm not asking you to speculate.
6      Based on your experience reviewing medical records,
7      would you agree that the rates that some hospitals
8      have accepted as payment in full from either Medicare
9      or Medi-Cal can be as little as ten percent of their
10     listed rate for services?
11             A     Well, I know -- I think Medicare is
12     better than Medi-Cal.  Medi-Cal rates can be very
13     cheap.
14             Q     And when you say "very cheap," what do
15     you mean by that for the Medi-Cal rate?
16             A     It could be 20 percent they may pay on
17     the dollar.
18             Q     And then let's get to the question I
19     think you were trying to address before.  Why is it,
20     when you're performing or preparing your life care
21     plan, do you look at the publicly listed daily rate
22     from a facility?
23             A     That's just the way I've been doing it
24     since the mid 1990s when I worked with other life
25     care planners.  I use the same resources that they do
```

                                                    39

1   because we're not supposed to speculate.  I can tell

2   you, if all hospitals, if all they took were Medi-Cal

3   patients, they would go out of business.  They would

4   have to close their doors.

5           Q     And when you are using the term

6   "speculate," how would you distinguish using your own

7   term between speculating and predicting?

8           A     Well, I think the triers of fact in

9   this case would be the jury.  Do we, the taxpayers,

10  pay for Nathan Glover's medical care, or do the

11  responsible parties do?  And I am not involved in

12  that part of the case.

13          Q     I want to focus just on your use of

14  the term "speculate."  How would you define

15  "speculate" as you just used it?

16          A     Well, because, like I said, when I was

17  medical director of rehab at St. Jude, every calendar

18  year we'd have to drop new contracts, not only with

19  Medi-Cal and Medicare, but, you know, other

20  third-party payers.  And that rate would change every

21  calendar year.  So for me to be able -- you know, I

22  don't work for Medi-Cal or Medicare.  I'd feel more

23  comfortable if you brought them in and testified.

24          Q     With respect to what the cost of

25  future medical care would be, you would agree there

                                                    40

1    is not complete certainty on that issue?

2         A    I think that's why I give the current

3    cost.  And then someone like Ms. Inouye has to, you

4    know, do the "medflation."

5         Q    And would you also agree there's not

6    complete certainty in offering opinions on the exact

7    treatment that a patient will require in the future?

8         A    No.  That's why I say it has to be

9    51 percent, at least 51 percent.  Based on my

10   clinical experience as a physician in physical

11   medicine and rehabilitation, we are really the only

12   specialty in medicine that's trained to treat

13   patients with spinal cord injury.  In all my 40 years

14   of clinical practice, I've followed patients similar

15   to Mr. Glover and can see what they need over their

16   lifetime, what's medically probable that will be

17   necessary.

18        Q    And if something has a 51 percent

19   probability of occurring in the future, that is

20   something that you would include in your report as an

21   item that is necessary?

22        A    Fifty-one percent or greater.  For

23   example, the acute hospitalizations, I can't tell you

24   what it will be from.  Will it be from a fall?  Will

25   it be from a urinary tract infection?  Will it be for

                                                      41

1    closure of the pressure sore which he's gonna need?

2    I can't tell you the specific cause for

3    hospitalization.  I just know that he's gonna need

4    one every eight years over life is very conservative,

5    but that's assuming that he has other things in the

6    life care plan and the caregiving person that he

7    needs to minimize complications from his reduced

8    mobility.

9            Q      Would you agree that, if there is a

10   51 percent chance of an event occurring in the

11   future, then there is also a 49 percent chance that

12   the event will not occur in the future?

13           A      That seems to add up.

14           Q      Let's take a look at page 9 of the

15   life care plan that you prepared.  That's under the

16   heading of "Therapies"; is that correct?

17           A      Yes.

18           Q      And in this section you've itemized a

19   number of types of therapy that Mr. Glover will

20   require over the remainder of his life; is that

21   correct?

22           A      Correct.

23           Q      And would a patient with complete

24   paraplegia require more therapy than a patient with

25   incomplete paraplegia?

                                                    42

```
 1              A      Well, usually that would be the case.
 2    It depends, though, if you have an incomplete para --
 3    sorry -- and we're trying to get him able to ambulate
 4    household distances, he may require more physical
 5    therapy than a complete para where you are
 6    strengthening his abnormal muscles, his upper body,
 7    his wheelchair skills.
 8              Q      Page 10 of the life care plan is under
 9    the subheading of "Other Services"; is that correct?
10              A      Yes.
11              Q      And the first item on page 10, it says
12    PCA No. 1.  Do you see that?
13              A      Yes.
14              Q      Is that a personal care aide?
15              A      Yes.
16              Q      And you've opined that Mr. Glover will
17    require a personal care aide for three eight-hour
18    shifts every day for the remainder of his life; is
19    that correct?
20              A      Yes.
21              Q      And then in the next item, you've
22    opined that Mr. Glover will require a second personal
23    care aide, who would work 16 hours per day for seven
24    days a week for the remainder of his life; is that
25    correct?
```
                                                           43

```
 1              A      Correct.

 2              Q      So with those two items, Mr. Glover

 3      would require, for example, five different personal

 4      care aides working eight-hour shifts every single day

 5      for the remainder of his life; is that correct?

 6              A      Yes.

 7              Q      And is that consistent with the level

 8      of personal care aides -- strike that.

 9              Do you have any complete paraplegia patients

10      who have had five eight-hour personal care shifts in

11      their home every day?

12              A      Yes.

13              Q      How frequently has that occurred?

14              A      It's less frequent than frequent.  It

15      depends on their financial situation, if there's the

16      funding, if it's a younger person, if the parents

17      have the financial wherewithal to afford it.

18              Q      And with respect to incomplete

19      paraplegia patients, have you ever had an incomplete

20      paraplegia patient who required five eight-hour

21      personal care aide shifts in their home every single

22      day?

23              A      No, I don't think so.  I think they

24      usually have one personal care attendant to assist

25      them 24 hours, 7 days a week.
```

1          Q     So for an incomplete paraplegia

2     patient, what would you say is -- well, strike that.

3              If you were preparing a life care plan for

4     an incomplete paraplegia patient, what would be your

5     recommendation in terms of personal care aides?

6          A     Well, if they are able to reposition

7     themselves --

8              MR. SINCICH:  Incomplete hypothetical.  Go

9     ahead.

10             THE WITNESS:  If they are able to reposition

11    themselves in bed, you know, change their positions,

12    if they are able -- if they're, like, a minimal

13    assist, 25 percent help or less with wheelchair

14    transfers, they wouldn't require someone at night

15    usually.

16    BY MR. OYSTER:

17         Q     In the past 12 months, has Mr. Glover

18    had any personal care aides in his home?

19         A     I don't think so.  I think his -- the

20    girlfriend at night.  The grandmother is there to

21    assist him, and I think she's the primary caregiver,

22    but the girlfriend has also helped.

23         Q     In general, in this description on

24    page 10, would you agree that a patient with

25    tetraplegia would require more personal care

                                                      45

1    assistance than a patient with complete paraplegia?

2         A    Again, depending on the weight of the

3    patient, the -- how much spasticity they have and how

4    much neuropathic pain they have.

5         Q    And, in general, would you agree that

6    a patient with complete paraplegia would require more

7    personal care assistance than a patient with

8    incomplete paraplegia?

9         A    It depends on the patient, if they

10   have a very strong upper body and they have minimal

11   pain, minimal spasticity.  Say, for example, they

12   could be a complete paraplegic.  They don't have as

13   much spasticity, and they have a really strong upper

14   body.  They could be requiring less help because

15   their wheelchair transfers are better.  Compare that

16   to a patient who has a lot of severe pain and

17   spasticity; so they are unable to perform their

18   wheelchair transfer with minimal assist or less help.

19        Q    And in your answer you're describing

20   two different sets of symptoms that a complete

21   paraplegic could have?

22        A    Correct.

23        Q    Let's take a look at page 11 of your

24   life care plan.  That's under the heading "Other

25   Equipment"; is that correct?

                                                      46

1          A      Yes.

2          Q      And these are items that Mr. Glover

3    will require over the duration of his life?

4          A      Yes.

5          Q      And the first item you have is a van

6    with a conversion package.  Do you see that?

7          A      Yes.

8          Q      Do you have an understanding of

9    whether Mr. Glover has left his home at any point in

10   the past 12 years -- I'm sorry -- in the last 12

11   months?

12         A      Thank you.  I saw some of his

13   out-patient medical visits that were done over the

14   telephone or telemedicine visits.  He has had

15   hospitalizations for surgeries, but I don't know the

16   past 12 months.  I know he's got pressure sores, and

17   he required treatment for those.

18         Q      When you say that he has pressure

19   sores and require treatment for those, is that based

20   on what he told you during the Zoom meeting?

21         A      Yes.  And some of the photographs I

22   saw.

23         Q      And the items on page 11 -- would a

24   patient with tetraplegia require more items than a

25   patient with paraplegia?

                                                47

1          A     I think they would require the same

2     thing on page 11.

3          Q     On page 11 would a patient with

4     complete paraplegia require additional items than a

5     patient with incomplete paraplegia?

6          A     It depends on the patient.  If the

7     patient is able to stand, he might not require the

8     roll-under showers, sinks that the complete

9     paraplegia requires.  They would probably require the

10    extra room, though, for durable medical equipment.

11         Q     And on page 12 you have a supply list

12    of items that Mr. Glover will require over the

13    remainder of his life; is that correct?

14         A     Yes.

15         Q     And these items -- are these items

16    that would be required for any level of spinal

17    injury?

18         A     Well, if they have preservation or

19    sacral sparing and they don't require the

20    intermittent catheterizations, then we would take out

21    that $1,100 per month fee.

22         Q     Is there anything else that might be

23    different?

24         A     I think everything else would be

25    similar, yes.

                                                      48

1          Q     Now, did you form any opinion on

2     Mr. Glover's life expectancy?

3          A     Oh, yes.  In my clinical opinion, with

4     the life care plan that I formulated for --

5     specifically for Nathan Glover, he can live 43 more

6     years from the date of this report, which was last

7     month, I believe.

8          Q     And that -- what is the basis for that

9     opinion that Mr. Glover's life expectancy is 43 years

10    from the date of the report?

11         A     He has no diabetes, no hypertension.

12    The only medications he's on is for the spasticity

13    that he has and the antibiotics that he has to go on

14    during his urinary tract infections.  He has some

15    anxiety and depression, but that should be able to be

16    controlled.  So, in other words, his vital organs are

17    working.  But I did use as a guideline, the Alabama

18    study that talks about -- I don't know.  Did I send

19    you a copy of this article?  I hope.

20         Q     I don't recall.  You may have.

21         A     This is -- I don't know how to share

22    the screen.  Terrible.

23         Q     Is that study specific to life

24    expectancy for people that have suffered spinal

25    injuries?

                                                       49

```
 1              A      Yes.

 2              Q      And just in case I don't have it --

 3              A      Okay.

 4              Q      Can you read -- what is the title of

 5      the study that you're reading?

 6              A      So the title of the study is

 7      "Traumatic Spinal Cord Injury Facts and Figures at a

 8      Glance."  It's dated 2023.  And so this -- they give

 9      the different levels of spinal cord injury.  And for

10      Mr. Glover I had to do a little bit of math, and I

11      think his -- there would be some reduction.  I think,

12      like, 39 years -- I mean, only have the life

13      expectancy of 39 years, but those are patients --

14      when you look at the hundreds of patients they did

15      this study on, patients with spinal cord injury

16      over -- you know, throughout the nation, most of them

17      do not have life care plans.  They live at or below

18      poverty level, that Medi-Cal level that we kind of

19      touched on that earlier.

20              So in my opinion, because he doesn't have

21      the diabetes, he's -- what he told me he doesn't

22      abuse alcohol and he doesn't abuse opioids, there's

23      no reason for him to live a -- have a significant

24      reduction in life expectancy.

25              Q      Is the general premise of the study
```

                                                        50

1    that you're referring to that patients who suffered a

2    spinal injury would have a reduced life expectancy

3    all else being equal than the general population?

4              A     Yes.

5              Q     And in this case, the 43 years from

6    the date of your report, that projects that

7    Mr. Glover would live to be about 70 years old?

8              A     Yes.  So that -- with that reduction,

9    correct.

10             Q     And do you have an opinion on what

11   Mr. Glover's life expectancy was prior to the

12   incident?

13             A     No.

14             Q     And, in general, if you are trying to

15   calculate someone's life expectancy, there are a

16   series of tables that can be used that can look at

17   someone's age and gender and then give an average of

18   how -- what their remaining life expectancy is; is

19   that correct?

20             A     Yeah.  It's usually like a bell shape

21   curve.  And will he be -- which side will he be?  At

22   the mid line or to the right or the left of the

23   curve?  Yes.

24             Q     And there are a number of, let's say,

25   environmental factors that can impact someone's life

                                                    51

1    expectancy to make it so that person might be

2    projected to live longer than the average or less

3    than the average.  Would you agree with that?  Let me

4    ask a better question.  Let me take out the word

5    environment and ask a different -- I'll take that

6    out.

7            Would you agree there are a number of

8    factors that can determine whether or not someone's

9    own life expectancy might be either greater than the

10   average or less than the average?

11           A    Yeah.  If you are talking about people

12   who do bungee cord jumping, usually they are a higher

13   risk of, you know, not living as long, high risk kind

14   of activities.

15           Q    So sometimes people can be engaged in

16   high risk activities that would mean their own life

17   expectancy is less than what you would find when you

18   looked at a chart and saw the average.  Would you

19   agree with that?

20           A    Yes.

21           Q    And, conversely, somebody who was at

22   an optimal body mass index who ate a healthy diet and

23   exercised regularly might have a life expectancy that

24   exceeded that average that you find when you look at

25   the chart; correct?

                                                      52

1        A      Correct, yes.

2        Q      Along the lines of the high risk

3  activities, based on your experience, would you agree

4  that being a member of a street gang is the type of

5  high risk activity that would reduce someone's life

6  expectancy?

7        MR. SINCICH:  Calls for speculation.

8  Incomplete hypothetical.  You can answer.

9        THE WITNESS:  It could be, yes.

10  BY MR. OYSTER:

11        Q      And have you ever reviewed any data

12  suggesting that members of a street gang are at a

13  much higher risk of being victims of a homicide than

14  the general population?

15        A      I'd say that's -- yes.

16        Q      Do you have any information of what

17  you've reviewed as to whether Mr. Glover was a member

18  of a street gang at the time of the incident?

19        A      No.  Not in the medical records I

20  reviewed, no.

21        Q      Now, in the course of your work, you

22  never performed a physical examination of Mr. Glover;

23  correct?

24        A      Correct.

25        Q      And you don't have any independent

53

1    opinions as to the medical injury that Mr. Glover

2    suffered; correct?

3           A      Based on my own physical exam,

4    correct.  That's correct.

5           Q      And what I mean by that is your life

6    care plan is based on the conclusions that were

7    contained in the medical records from people who

8    examined Mr. Glover; correct?

9           A      Correct, yes.  I'm assuming that what

10   they charted was medically accurate, yes.

11          Q      So in forming -- well, strike that.

12          You are assuming, for the purposes of your

13   opinions, that Mr. Glover suffered a severe spinal

14   injury, and your assumption is based on the

15   information contained in the medical records;

16   correct?

17          A      Correct.

18          Q      Now, in this case have you ever

19   reviewed any medical records indicating that

20   Mr. Glover suffered incomplete paraplegia?

21          A      No.  I haven't seen that.

22          Q      Are there any other opinions that you

23   intend to offer at the time of trial other than what

24   we've gone through in your deposition today?

25          A      I probably want to read your life care

                                                    54

```
1    planners and the physician basis prior to trial.

2            Q       Is there anything else?

3            A       No.

4            Q       And have you now told me about the

5    basis for all of your opinions during your deposition

6    today?

7            A       Yes.

8            Q       And is there any additional work that

9    you might perform in this case -- let me reask that.

10           Is there any additional work that, as you

11   sit here now, you plan to perform on this case?

12           A       Unless the -- if I would be able to

13   examine Mr. Glover in my office prior to trial but --

14           Q       And --

15           A       -- as long the --

16           Q       Go ahead.

17           A       Now you have me doubting the medical

18   records.  But I have -- I have good confidence in

19   Rancho Los Amigos, but that would be the only other

20   thing I would see doing.

21           Q       Is there any reason why you did not

22   examine Mr. Glover in this case?

23           A       No.  I kind of felt that, seeing him

24   on Zoom and being told his problems, his clinical

25   profile actually falls into a complete paraplegic.  I
```

                                                              55

```
 1    didn't see anything, you know, in Zooming with him
 2    that would make me doubt that.
 3           Q    And on the Zoom was anyone else
 4    present on his end, to the best of your knowledge?
 5           A    Usually I'll write down their name.
 6    But I don't believe so.  I think it was just
 7    Mr. Glover.
 8           MR. OYSTER:  I have no additional questions.
 9           MR. SINCICH:  Let me see if I need to ask
10    any as follow-up.
11           (A pause in the proceedings.)
12           MR. SINCICH:  I might just have a couple.
13    I'm not sure if this -- maybe I just didn't
14    understand it as clear; so maybe if I can just ask a
15    couple of questions to see if I understand you
16    correctly.
17
18                    EXAMINATION
19    BY MR. SINCICH:
20           Q    Earlier do you recall talking about
21    how a patient with incomplete paraplegia can regain
22    movement and urinary function?
23           A    Yes.
24           Q    And I believe you mentioned that most
25    likely, if they were going to do that, it would
```

                                                      56

```
 1    happen within the first six months?

 2          A    Yes.

 3          Q    I'm not sure if you were asked.  I

 4    didn't write it down; so if you can remind me.  Is

 5    there a percentage that you have in mind of the

 6    probability that, say, a year and a half after an

 7    incident that a person even with incomplete

 8    paraplegia would be able to regain movement or

 9    urinary function if they hadn't done so within the

10    first six months?

11          A    No.  I mean, we usually see

12    neurologically and functionally where they stand by

13    six months, you know, how they present if they have

14    sacral sparing or not.

15          Q    From your review of the medical

16    records and discussions with Mr. Glover over Zoom,

17    what's your understanding of his ability to ambulate?

18          A    He's nonambulatory.  He's not able to

19    ambulate.  He has no movement or even sensation in

20    his legs, in his hip extensors or abductors, nothing

21    working.

22          Q    And based on your review of that

23    information, what's your understanding of

24    Mr. Glover's urinary function?

25          A    He has a urinary tract infection
```

```
 1    almost monthly, every month; so he doesn't have
 2    control of his bowel or bladder.
 3            Q       For instance, do you know if he has a
 4    catheter?
 5            A       Oh, yes -- I'm sorry -- he does.  He
 6    has to insert a catheter every three to four hours.
 7            Q       Do you know if he has control over his
 8    bowel movement?
 9            A       No.  He does a bowel program, and he
10    does get incontinence of his stool.  He has to do a
11    digital evacuation of the rectum to get a bowel
12    result, but he usually gets episodes of constipation,
13    and that will trigger what we call "autonomic
14    dysreflexia," which is where the blood pressure
15    usually goes very high and if untreated can result in
16    intracranial hemorrhage and death.
17            Q       And then you mentioned something with
18    regard to hospitalization.  I'm trying to recall.  I
19    believe in your report you put that it's projected
20    that Mr. Glover would require hospitalization once
21    every eight years?
22            A       That's -- that is a good question.
23    That's what the life care plan that I formulated for
24    him being available to him.  If he doesn't have it,
25    he would require probably more hospitalizations than
```

                                                      58

1    every eight years.

2            Q     And from speaking to Mr. Glover, do

3    you know how often he's been hospitalized per year on

4    average since the incident approximately?

5            A     Well, I know because of the pressure

6    sore he's had infection for that.  He's had to be

7    anticoagulated for a deep vein thrombus in his right

8    leg.  He's had infection from the pressure sore.

9    He's had to have 12 surgeries; so he's had a lot of

10   complications.  But I don't know what that amounts to

11   every year on average.

12           MR. SINCICH:  Thank you.  I don't have any

13   further follow-up at this time.

14           MR. OYSTER:  I have no additional questions.

15           MR. SINCICH:  And then if you -- if we can

16   go off the record for a second.

17           MR. OYSTER:  Sure.

18

19           (Whereupon the proceedings

20           concluded at 2:39 p.m.)

21

22

23

24

25

                                                      59

1    I, the undersigned, declare under penalty of

2    perjury that the foregoing is true and correct.

3    Executed on _____, 2023, at

4    _____, California.

5

6

7

8                              _____

9                                    SHARON K. KAWAI, M.D.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              60

<u>REPORTER'S CERTIFICATE</u>

I, SAMANTHA PAOLETTO, Certified Shorthand Reporter for the State of California, hereby certify:

THAT the witness in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth, and nothing but the truth;

THAT said deposition was written by me in stenotype and was thereafter reduced to printed matter under my direction and supervision;

THAT the foregoing transcript is a true record of the testimony given by the witness and of all objections made at the time of the examination, to the best of my ability.

I FURTHER CERTIFY that I am in no way interested in the outcome of said action.

IN WITNESS WHEREOF, I have hereunto subscribed my hand this 3rd day of September, 2023.

_____*Samantha Paoletto*___

SAMANTHA PAOLETTO
Certified Shorthand Reporter
Certificate No. 11393

61

1        <u>REPORTER'S COPY CERTIFICATE</u>

2

3

4            I, SAMANTHA PAOLETTO, Certified Shorthand

5      Reporter for the State of California, hereby certify:

6            THAT the foregoing is a true and correct copy

7      of the original record of the testimony given by the

8      witness and of all objections made at the time of the

9      examination, to the best of my ability.

10           I FURTHER CERTIFY that I am in no way

11     interested in the outcome of said action.

12           IN WITNESS WHEREOF, I have hereunto

13     subscribed my hand this 3rd day of September, 2023.

14

15

16     _____*Samantha Paoletto*_____

17     SAMANTHA PAOLETTO
       Certified Shorthand Reporter
18     Certificate No. 11393

19

20

21

22

23

24

25